[This opinion has been published in *Ohio Official Reports* at 67 Ohio St.3d 274.]

THE BELVEDERE CONDOMINIUM UNIT OWNERS' ASSOCIATION, APPELLEE, v.

R.E. ROARK COMPANIES, INC. ET AL., APPELLANTS.

[Cite as *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.*,

**1993-Ohio-119.]**

*Real property—Condominium owners' association may maintain an action against a condominium developer for breach of fiduciary duty, when—R.C. 5311.26 imposes strict liability for condominium developer's failure to disclose to prospective relevant financial information concerning the development purchasers—Corporations—Corporate form may be disregarded and individual shareholders held liable for wrongs committed by the corporation, when.*

1. A condominium owners' association may not maintain an action against a condominium developer for breach of fiduciary duty absent an understanding by both parties that special trust and confidence have been reposed in the developer.

2. R.C. 5311.26 imposes strict liability for a condominium developer's failure to disclose to prospective purchasers relevant financial information concerning the condominium development.

3. The corporate form may be disregarded and individual shareholders held liable for wrongs committed by the corporation when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

(No. 92-30—Submitted April 7, 1993—Decided September 15, 1993.)

APPEAL from the Court of Appeals for Hamilton County, No. C-900581.

———————————

{¶ 1} This appeal stems from a lawsuit brought by appellee, the Belvedere Condominium Owners' Association ("the Association"), against appellants, R.E. Roark Companies, Inc. ("RERC") and Ronald E. Roark ("Roark"). The Association's complaint alleged that RERC and Roark had breached alleged fiduciary duties to the Association and violated the Ohio Condominium Act.

{¶ 2} There are four major players in this dispute: the Association, RERC, Roark, and Bellhill, Ltd. ("Bellhill"). The Association is composed of the owners of the residential condominium units in the Belvedere, a Cincinnati building that contains both residential and commercial space. The building has a total of eighty-eight residential units. The ground floor of the Belvedere includes forty-seven hundred square feet of commercial space. RERC is a Columbus-based real estate developer and Roark is RERC's majority shareholder. Bellhill, a limited partnership, was the developer of the Belvedere Condominiums. RERC was the general partner in Bellhill and held a twenty percent interest in Bellhill. Roark, individually, was neither a general nor a limited partner of Bellhill.

{¶ 3} In 1981 the original developer of the Belvedere Condominiums apparently found itself unable to continue the project. In December 1981, Bellhill was formed to replace the original developer and finish the development. At that time Bellhill purchased the sixty-nine residential units that had not been sold to individual unit owners.

{¶ 4} The Association, which was formed as required by Ohio law, was the owner of all of the common areas in the Belvedere development. The common areas included the forty-seven hundred square feet of ground floor commercial space.

{¶ 5} In December 1981 the Association leased all of the Belvedere's commercial space to RERC. Prior to the execution of the lease, less than one thousand square feet of the commercial space was occupied. The lease was for a term of five years and RERC was given renewal option rights for four subsequent five-year periods at the same price, terms, and conditions. The rent was fixed at $21,600 per year. Under the lease the Association was responsible for obtaining and maintaining insurance coverage, parking facilities, and lighting in all common areas. The Association was also responsible for general maintenance and repair of the property. Finally, the Association agreed to pay all utilities, taxes, and assessments on the common areas. At trial, an expert witness for the Association testified that this lease was unfair and one-sided.

{¶ 6} At the time of the execution of the lease, Bellhill owned a majority of the units in the development and, therefore, controlled the board of the Association. Four of the five members of the board were employees of one or more companies owned or controlled by Roark. At trial, Roark testified that RERC spent approximately $103,400 renovating the commercial space after the lease was executed. Roark also testified that the lease was necessary because federal mortgage insurance agencies would not insure financing of individual residential units unless the commercial space was covered by a long-term lease.

{¶ 7} The existence of the lease was revealed to prospective and former condominium unit purchasers in a disclosure statement required by law. The statement mentioned the lease twice. On the second page it stated that "[t]he Common Areas and Facilities include approximately 4,712 square feet of commerical space. This commercial space has been leased on a long term basis by the R.E. Roark Companies, Inc." On page twenty, the statement mentioned again that the "Unit Owner's Association has entered into a lease with The Roark Companies, Inc. of Columbus, Ohio for all of the commercial space on the first floor of the building." Roark testified that a copy of the lease was given to the five

or six prospective purchasers who requested one and the disclosure documents were given to all of the unit owners who had bought their property prior to the execution of the lease. The disclosure documents did not reveal that RERC held a twenty percent interest in Bellhill and was Bellhill's general partner.

{¶ 8} Bellhill was unable to sell on the open market all of the residential units it owned. The remaining units were sold at auction in 1983. At the same time, Bellhill transferred control of the Association's board to individual unit owners.

{¶ 9} Between 1981 and 1986, RERC sublet portions of the commercial space to five different sublessees. In May 1986 RERC assigned its entire leasehold interest to the Superior Title Agency, Inc. Superior Title paid RERC over $100,000 in consideration for the assignment.

{¶ 10} In 1987, some four years after the individual unit owners had gained control over the Association's board, the Association filed this action against RERC and Roark. The complaint charged that RERC and Roark violated their fiduciary duties to the Association by causing the original lease to be executed. It also alleged that they did not adequately disclose the existence and nature of the lease to prospective purchasers. The Association sought damages in the amount of the difference between the rent agreed to in the lease and the value of the lease had it been negotiated at arm's length.

{¶ 11} After hearing evidence from both parties, the trial court entered judgment in favor of the Association against RERC and Roark, jointly and severally, for $100,000 plus interest. The court explained its reasoning in a June 19, 1990 letter to counsel. It found that RERC and Roark were liable for fraudulent self-dealing in entering into the lease agreement with the Association. The court wrote that the "lease on its face is completely one sided" and that "[c]ommon sense tells one that there is something 'rotten in Denmark' when a lease such as this is executed." It focused on the renewal options given to RERC, RERC's subsequent

4

assignment of the lease for $100,000, the provisions of the assignment, and the "devious" way in which the terms of the lease had been disclosed to unit buyers.

{¶ 12} The trial court concluded that Roark, individually, was liable for the acts committed by RERC. In the briefest sort of way, the court wrote that Roark had "complete domination and control" over RERC and thus was liable for the company's wrongs.

{¶ 13} RERC and Roark appealed and the court of appeals affirmed. The court first considered whether the trial court's finding of fraud was supported by sufficient evidence. It analyzed the Association's fraud claim under the framework of common-law fraud. It specifically found that the evidence adduced at trial supported all five elements of common-law fraud: (1) knowledge of a material fact, (2) concealment of that fact, (3) intent to induce reliance, (4) actual reliance, and (5) injury resulting from reliance.

{¶ 14} The court then reviewed the trial court's ruling that Roark was personally liable. Following a three-part test used by the United States Court of Appeals for the Sixth Circuit in *Bucyrus-Erie Co. v. Gen. Products Corp.* (C.A.6, 1981), 643 F.2d 413, it held that the trial court properly disregarded the corporate fiction in order to reach Roark individually. It was convinced by the record "that Roark engaged in a series of transactions which, if taken as a whole, demonstrate that he acted in his own personal interest to the detriment of the appellee."

{¶ 15} Finally, the court held that RERC and Roark did breach a fiduciary duty to the Association. The question of whether such a fiduciary duty exists was not raised or answered by the court. It seemed to hold only that the lease was one-sided, RERC and Roark controlled the Association's board when the lease was executed and, therefore, a fiduciary duty was breached.

{¶ 16} RERC and Roark appeal from the judgment of the court of appeals. The cause is now before this court upon the allowance of a motion to certify the record.

_Manley, Burke & Fischer_ and _Timothy A. Fischer_, for appellee.

_Griffin & Fletcher_ and _Michael C. Fletcher_; _H. Fred Hoefle_; _Bayh, Connaughton, Fensterheim & Malone_, _G. David Fensterheim_ and _Kevin C. Golden_, for appellants.

_Lee Fisher_, Attorney General, _Nancy J. Miller_, Deputy Chief Counsel, and _Robert A. Zimmerman_, Assistant Attorney General, urging affirmance on behalf of _amicus curiae_ Lee Fisher.

_Thompson, Hine & Flory_, _Kenton L. Kuehnle_ and _Margaret R. Carmany_, urging reversal on behalf of _amicus curiae_ Ohio Home Builders Association.

_____

**WRIGHT, J.**

{¶ 17} This appeal requires the court to construe the Ohio Condominium Act, R.C. Chapter 5311. It presents three primary issues: whether a condominium developer owes a fiduciary duty to a condominium owners' association, whether there is sufficient evidence in the record to support a finding that RERC or Ronald E. Roark violated the Condominium Act by failing to disclose or inadequately disclosing material facts regarding the lease in question, and whether Ronald E. Roark, as an individual, can be held liable to the Association.

{¶ 18} We hold that condominium developers do not have a fiduciary duty to condominium owners' associations under the Act. We also find that the courts below used the wrong criteria in considering whether RERC or Roark is liable for failing to adequately disclose information regarding the lease. Finally, we conclude that the court of appeals erred in allowing RERC's corporate veil to be pierced. Therefore, the judgment of the court of appeals is reversed and the cause remanded to the common pleas court to act in accordance with this opinion.

I

A

**{¶ 19}** We first must deal with the Association's contention that we should not decide whether developers owe a fiduciary duty to owners' associations. The Association argues vigorously that this issue ought not be considered by this court because it was not expressly briefed or argued in the courts below. The Association would have us assume that there is such a duty and go on to decide whether RERC breached that duty. This we cannot do.

**{¶ 20}** As a general rule, this court will not consider arguments that were not raised in the courts below. See *State v. 1981 Dodge Ram Van* (1988), 36 Ohio St.3d 168, 170, 522 N.E.2d 524, 526. The waiver doctrine, however, is not absolute. *Id.* at 169-170, 522 N.E.2d at 526; *In re M.D.* (1988), 38 Ohio St.3d 149, 527 N.E.2d 286. When an issue of law that was not argued below is implicit in another issue that was argued and is presented by an appeal, we may consider and resolve that implicit issue. To put it another way, if we must resolve a legal issue that was not raised below in order to reach a legal issue that was raised, we will do so.

**{¶ 21}** In this case, the issue of whether condominium developers owe a fiduciary duty to owners' associations is implicit in the question whether RERC breached that duty. It would be irresponsible for us to assume, for the sake of one case, that such a duty exists. Part of our role in the court system is to decide cases involving issues of broad public interest in such a way that the law can be applied in an orderly and predictable manner. Predictability is highly valued in American jurisprudence. To assume an answer to an unsettled issue would be to ignore our responsibilities and intentionally leave the law unsettled and unpredictable. We therefore choose to decide this issue, which has been fully briefed in this court.

B

**{¶ 22}** In 1963 the Ohio Condominium Act ("Act") was enacted by the General Assembly. Am.S.B. No. 18, 130 Ohio Laws 1425. The Act recognized, for the first time under Ohio law, the condominium as a form of real property. See

130 Ohio Laws at 1251; Note, Ohio Amends It's [sic] Condominium Act (1979), 4 U. Dayton L.Rev. 503. It specifically addressed "(1) the creation of a condomiunium form of cooperative ownership, (2) the respective interests each unit owner possessed in the common areas, (3) the condominium administration, (4) the rights of lienors, and (5) the removal of the property from the Act's provisions." (Footnotes omitted.) Blackburn & Melia, Ohio Condominium Law Reform: A Comparative Critique (1978), 29 Case W.Res.L.Rev. 145, 147-149.

{¶ 23} One of the Act's new requirements was the creation of unit owners' associations to administer condominium property. Former R.C. 5311.08, 130 Ohio Laws 1254. This was a novel development in Ohio law. An owners' association acts as a "quasi-government entity paralleling in almost every case the powers, duties, and responsibilities of a municipal government." Hyatt & Rhoads, Concepts of Liability in the Development and Administration of Condominium and Home Owners Associations (1976), 12 Wake Forest L.Rev. 915, 918. Under the 1963 Act, the developer, as owner of the majority of units during the infancy of the development, controlled the unit owners' association for an indefinite period of time. The effect was "that the developer during the period [in which it controls the association] has two separate and distinct loyalties: the operation of the association and the development and marketing of the project. There is an inherent conflict of interest in this situation, for some decisions will of necessity have to be made that benefit one loyalty at the expense of the other." *Id*. at 973.

{¶ 24} Recognizing this absolutely unavoidable conflict of interest, the General Assembly took specific steps in 1978 to protect condominium unit owners by amending the Act. Am.Sub.H.B. No. 404, 137 Ohio Laws, Part II, 2594. Among other improvements, the amendments added three new provisions, R.C. 5311.25, 5311.26, and 5311.27, and amended one existing provision, R.C. 5311.08. 137 Ohio Laws, Part II, 2606-2621. These new and newly amended sections were intended to protect condominium owners and purchasers from developer abuse.

See Blackburn & Melia, *supra*, 29 Case W.Res.L.Rev. at 148. "The amendments strike a balance between preservation of the developer's investment and the protection of unit owners from unfair management practices. This is done primarily through the establishment of a time requirement for the initial owners meeting and a timetable for the gradual transfer of control from the developer to the other unit owners." *Id.* at 182. See, also, Note, *supra*, 4u. Dayton L.Rev. at 504 ("[t]he legislation is an attempt to walk the fine line between providing protection for the potential condominium purchaser and not unduly restricting the condominium developer's ability to shape his project as he sees fit").

{¶ 25} Even after the 1978 amendments, the developer controls the owners' association in its infancy. Initially, the developer has the right to appoint members of the board and to exercise the powers of the association. R.C. 5311.08(D). Amended R.C. 5311.08, however, imposes a timetable for relinquishing control of the association to individual unit owners other than the developer. Pursuant to R.C. 5311.08(C) when units controlling at least twenty-five percent of the common areas have been sold, unit owners other than the developer must elect at least twenty-five percent of the association board. When fifty percent of the control over the common areas has been sold, unit owners other than the developer must elect at least one third of the board. The developer's control of the owners' association ends and the unit owners are entitled to elect the entire board three years after the formation of the owners' association or thirty days after the sale of seventy-five percent of the condominium instruments, whichever comes first. R.C. 5311.08(D).

{¶ 26} The three new sections added by the 1978 amendments, R.C. 5311.25, 5311.26, and 5311.27, are essentially consumer protection provisions and delimit and describe the authority of the developer. R.C. 5311.25 requires the developer to place certain information in the condominium instruments and prohibits the sale of a condominium unit unless the instruments contain the required

information. Of particular relevence to this case is R.C. 5311.25(D), which provides:

"Neither the unit owners association nor the unit owners will be subject to any management contract or agreement executed prior to the assumption of control required by division (C) of this section for more than one year subsequent to that assumption of control unless such a contract or agreement is renewed by a vote of the unit owners pursuant to the bylaws required by section 5311.08 of the Revised Code."

**{¶ 27}** We believe, and the parties appear to agree, that this provision entitles the board of the owners' association, once fully elected by the individual unit owners, to cancel contracts entered into by the developer-controlled board. This provision protects unit owners from inequitable contracts and agreements, including those similar to the lease that led to this litigation.

**{¶ 28}** R.C. 5311.26 requires that detailed information regarding "all material circumstances or features affecting the development" be disclosed to prospective purchasers. "This provision attempts to insure that the prospective buyer is fully aware of those factors that may influence his decision to purchase." Note, *supra*, 4 U. Dayton L.Rev. at 513. The assumptions behind this requirement are that it "will force developers to proceed more carefully in planning and selling units and that buyers will be able to make an informed decision before entering into a purchase." (Footnotes omitted.) Blackburn & Melia, *supra*, 29 Case W.Res.L.Rev. at 157.

**{¶ 29}** R.C. 5311.27 provides a statutory remedy for violations of R.C. 5311.25 and 5311.26. R.C. 5311.27(A) states that "[i]n addition to any other remedy available," a purchaser may rescind a sale contract. R.C. 5311.27(B) allows a purchaser to bring an action against the developer for violating R.C. 5311.25 or 5311.26 and sets forth the damages which may be levied against the developer. Finally, R.C. 5311.27(C) provides an avenue for public enforcement of the Act.

The Attorney General is permitted to bring a declaratory judgment action, obtain an injunction, bring a class action for damages, and request that the court appoint a receiver or master.

**{¶ 30}** It is clear that the Ohio Condominium Act and the 1978 amendments to the Act created relationships, rights, and remedies that did *not* exist at common law. The scope of the Act convinces us that it was meant to comprehensively define and regulate the law of condominium development, including the legal relationship between condominium developers and unit owners' associations.[1]

C

**{¶ 31}** Both the Association and *amicus curiae* the Attorney General argue that there exists some sort of common-law fiduciary duty which is applicable to the relationship between RERC and Roark and the Association. We find simply no Ohio authority that holds, or even suggests, that there is a common-law fiduciary relationship between condominium developers and unit owners' associations. Contrary to the apparent position of the Attorney General, Ohio most certainly has no "ancient and settled system" of condominium law.

**{¶ 32}** We believe that the relationships at issue in this case were created by the legislature and are defined in detail by the Ohio Condominium Act alone. Thus, we arrive at the central issue: whether the Act creates a fiduciary relationship between condominium developers and unit owners' associations.[2]

---

1. We note in passing that the Act is vague in parts and difficult of interpretation. Our reading of the Act attempts to give meaning to sometimes ambiguous provisions in light of its general goals. Any errors on our part, of course, may be corrected by the General Assembly.

2. The Association argues that this is not the issue. In addition to its argument that a common-law duty exists, it characterizes the issue as whether "[a] condominium developer who is a member of the board of an incorporated condominium owner's [*sic*] association owes fiduciary duties to the association under the Ohio Corporation Code." This appeal, however, does not require us to decide whether a board member of an incorporated entity owes fiduciary duties because neither RERC nor Roark was a member of the Association's board. If RERC or Roark is liable it is because they owe a duty to the Association in their capacities as developers, not board members.

{¶ 33} "A 'fiduciary relationship' is one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *In re Termination of Employment of Pratt* (1974), 40 Ohio St.2d 107, 115, 69 O.O.2d 512, 517, 321 N.E.2d 603, 609. The person in whom the "special confidence and trust" are reposed, the fiduciary, has a "duty to act *for someone else's benefit*, while subordinating [his or her] personal interests to that of the other person." (Emphasis added.) Black's Law Dictionary (6 Ed. 1990) 625. A fiduciary may not possess an interest of any sort that might conflict with an interest of the person to whom he or she owes a duty.

{¶ 34} Although a number of Ohio statutes expressly create fiduciary duties,[3] nowhere in R.C. Chapter 5311 is a fiduciary duty mentioned. Instead, we believe that the relationship between condominium developers and owners or purchasers is not unlike that which exists between creditors and consumers or sellers and buyers. Like R.C. Chapter 5311, Ohio's commercial statutes do not expressly impose a fiduciary duty. As a result, this court has held that a creditor/consumer relationship is not fiduciary "absent an understanding by both parties that a special trust and confidence has been reposed in the creditor." *Blon v. Bank One, Akron, N.A.* (1988), 35 Ohio St.3d 98, 519 N.E.2d 363, paragraph two of the syllabus; *Umbaugh Pole Bldg. Co., Inc. v. Scott* (1979), 58 Ohio St.2d 282, 12 O.O.3d 279, 390 N.E.2d 320. In *Layman v. Binns* (1988), 35 Ohio St.3d 176, 519 N.E.2d 642, we upheld the doctrine of *caveat emptor* in real estate transactions and recognized that no fiduciary duty exists between buyers and sellers of real property.

---

3. See, *e.g.*, R.C. 1701.59(B) (codifying duty between corporation and board of directors), R.C. 1339.03 *et seq.* (Uniform Fiduciary Act), R.C. Chapter 2109 (fiduciary duty in probate context), R.C. 3103.05 (fiduciary duty between spouses).

**{¶ 35}** R.C. Chapter 5311 recognizes the condominium as a form of real property and creates a system of rules to govern the development, sale, and management of condominium property, including the requirement that owners' associations be formed. It recognizes the relationships between condominium developers, owners' associations, and purchasers, and provides for the transfer of control from the developer to the owners and for the continuing government of the condominium property. And, most important for our purposes, it recognizes that certain conflicts are inherent in the relationships between the developers and the owners and purchasers. In response to these conflicts, the General Assembly added specific provisions intended to limit the power of the developer and to prevent condominium owners and purchasers from being deceived by unscrupulous developers.

**{¶ 36}** The Act, however, does *not* create a fiduciary relationship between developers and owners, developers and owners' associations, or developers and purchasers. In fact, we believe that it does just the opposite—it plainly recognizes that developers, owners, and purchasers have different, and often competing, financial interests.[4] Instead of prohibiting such competing interests by imposing a fiduciary duty on developers, the legislature adopted specific measures to regulate the different relationships and to protect the parties in weaker bargaining positions. These include the consumer protection provisions in R.C. 5311.08, 5311.25 and 5311.26 and the remedial provisions in R.C. 5311.27.

**{¶ 37}** If this court imposed a general fiduciary duty on developers it would literally shatter the statutory scheme. R.C. 5311.08 essentially *requires* self-dealing by developers during the early years of the development. *The General Assembly,*

---

4. *Amicus curiae* Ohio Home Builders Association observes that "[t]he impact of finding a 'fiduciary' responsibility will be to place individuals who agree to assist in the operation of such associations during such initial phases in the impossible position of being sued for any decision which can be interpreted as benefiting the developer."

*aware of the inherent dangers of self-dealing, gave owners' associations at the very least the express right to cancel contracts once the individual unit owners take control of the owners' association.* R.C. 5311.25(D). The Act also specifically includes the right to sue developers for violating its provisions. R.C. 5311.27. If developers had a general fiduciary duty, this statutory right of action would be superfluous because developers could simply be sued under the common law for breach of that duty.

{¶ 38} Prior to the 1978 amendments to the Act, public policy might have required us to impose some sort of fiduciary duty on developers in order to protect owners and purchasers. With the amendments, however, the intent of the General Assembly to create a regulated commercial relationship rather than a fiduciary relationship became clear. Therefore, as we have done in the context of other types of commercial cases, we hold that a condominium owners' association may not maintain an action against a condominium developer for breach of fiduciary duty absent an understanding by both parties that special trust and confidence have been reposed in the developer. Because there is no evidence in the record of such an understanding, the Association's claim for breach of fiduciary duty must be dismissed.[5]

II

{¶ 39} Both parties strenuously dispute the nature of the second issue we must address. The Association contends that its second claim against RERC and Roark is for a violation of the disclosure requirement of the Act, R.C. 5311.26.

---

5. In response to the dissent's criticism, we must make it clear that with respect to RERC's liability to the Association we have not "reweighed the evidence and substituted [our] judgment for that of the court of appeals." Quite to the contrary, we simply have found that the courts below utilized incorrect legal standards in reaching their judgments. That is, of course, why we remanded the cause to the trial court for further proceedings. If, as the dissent asserts, we were possessed of a "predetermined judgment," we would have reversed the court of appeals and ordered the trial court to issue judgment in all respect in favor of RERC.

14

RERC and Roark argue that the Association's cause of action sounds in common-law fraud. We accept the Association's characterization of its claim and hold that a violation of R.C. 5311.26 can be proved without evidence of intent to induce reliance or actual reliance.

{¶ 40} The Association argues that RERC and Roark failed to disclose material facts regarding the lease in accordance with the requirements of the Act. In its complaint the Association specifically alleged that the disclosure instruments did not adequately reveal the lease or the terms of the lease. In support of its argument it pointed to the December 1981 lease between RERC and the Association and the disclosure information provided to potential purchasers by Bellhill. The Association did not offer any evidence of actual reliance on the representations made in the disclosure documents.

{¶ 41} The Association asserts, however, that a violation of R.C. 5311.26 can be proved without evidence of actual reliance—that the fact of nondisclosure is alone sufficient to prove causation of damages. It contends that the disclosure requirements under the Condominium Act are analogous to those under federal securities law and that the failure to disclose a material fact, in and of itself, is a basis for liablity. See Section 78j(b), Title 15, U.S. Code; SEC Rule 10(b)(5); *Affiliated Ute Citizens of Utah v. United States* (1972), 406 U.S. 128, 153, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741, 761.

{¶ 42} R.C. 5311.26 provides in part:

"No developer or agent, directly or indirectly, shall sell or offer to sell a condominium ownership interest in a condominium development unless he discloses fully and accurately to each prospective purchaser of the interest all material circumstances or features affecting the development, by preparing and providing to each prospective purchaser a readable and understandable written statement of such circumstances or features. The statement shall not intentionally

omit any material fact or contain any untrue statement of a material fact and shall contain all of the following:

"***

"(I) A facsimile of any management contract or other agreement affecting the operation, use, or maintenance of or access to all or any part of the condominium development, with a brief narrative statement of the effect of each agreement upon a purchaser, including a specification of the services to be rendered and the charges to be made thereunder, and a statement of the relationship, if any, between the developer and the managing agent;"

"***

"(L) The significant terms of any encumberances [sic], easements, liens, and matters of title affecting the condominium development;

"***

"(N) A statement of any restraints on the free alienability of all or any part of the condominium development[.]"

{¶ 43} As discussed above, this is a consumer protection provision designed to shield unsophisticated purchasers from overreaching sellers. As such, we must construe it to effectuate this purpose. We believe that R.C. 5311.26 imposes strict liability for a developer's failure to make the proper disclosures. It imposes an absolute requirement that developers disclose relevant financial information concerning the condominium development.

{¶ 44} To prove a violation of this section, a plaintiff does not have to prove the five elements of common-law fraud. A plaintiff must merely prove a failure to disclose material information. Once this is done, liability attaches and the plaintiff must then prove damages under R.C. 5311.27.[6] As the United States Supreme

---

6. In this case R.C. 5311.27(B) would be the proper damages provision. It provides:

"(B) Any developer or agent who sells a condominium ownership interest in violation of section 5311.25 or 5311.26 of the Revised Code shall be liable to the purchaser in an amount equal to the difference between the amount paid for the interest and the least of the following amounts:

Court has stated in the context of securities regulation, the statutory obligation to disclose combined with the withholding of a material fact "establish[es] the requisite element of causation." *Affiliated Ute Citizens*, *supra*, 406 U.S. at 154, 92 S.Ct. at 1472, 31 L.Ed.2d at 761. Accordingly, proof of reliance is not essential to recovery.

{¶ 45} The court of appeals erred by analyzing the Association's claim under the common law. The common pleas court erred by merging its analysis of the fiduciary duty issue with analysis suggesting common law fraud or misrepresentation. Accordingly, we must remand this cause to the common pleas court to consider a factual issue: whether the information regarding the lease that was provided to prospective condominium purchasers satisfied the disclosure requirements of R.C. 5311.26.[7] If the trial court finds that the disclosure was inadequate, damages must be calculated and proven under R.C. 5311.27(B).

III

{¶ 46} The final issue we must consider is whether Ronald E. Roark, as an individual, can be held jointly and severally liable to the Association. This requires us to address the alter ego doctrine and the ability of a plaintiff to "pierce the corporate veil" in order to reach an individual shareholder.

---

"(1) The fair market value of the interest as of the time the suit is brought;

"(2) The price at which the interest is disposed of in a bona fide market transaction before suit;

"(3) The price at which the unit is disposed of after suit in a bona fide market transaction, but before judgment. In no case shall the amount recoverable under this division be less than the sum of five hundred dollars for each violation against each purchaser bringing an action under this division, together with court costs and reasonable attorneys' fees. If the purchaser complaining of the violation of section 5311.25 or 5311.26 of the Revised Code has brought or maintained an action he knew to be groundless or in bad faith and the developer or agent prevails, the court shall award reasonable attorneys' fees to the developer or agent."

7. It appears from the record that some purchasers may have received complete disclosure. Roark's testimony was that "five or six" prospective purchasers asked for and were given an actual copy of the lease.

**{¶ 47}** A fundamental rule of corporate law is that, normally, shareholders, officers, and directors are not liable for the debts of the corporation. See Presser, Piercing the Corporate Veil (1991) 1-4. An exception to this rule was developed in equity to protect creditors of a corporation from shareholders who use the corporate entity for criminal or fraudulent purposes. "That a corporation is a legal entity, apart from the natural persons who compose it, is a mere fiction, introduced for convenience in the transaction of its business, and of those who do business with it; but like every other fiction of the law, when urged to an intent and purpose not within its reason and policy, may be disregarded." *State ex rel. Atty. Gen. v. Standard Oil Co.* (1892), 49 Ohio St. 137, 30 N.E. 279, paragraph one of the syllabus. Under this exception, the "veil" of the corporation can be "pierced" and individual shareholders held liable for corporate misdeeds when it would be unjust to allow the shareholders to hide behind the fiction of the corporate entity. Courts will permit individual shareholder liability only if the shareholder is indistinguishable from or the "alter ego" of the corporation itself. See, generally, Presser, *supra*.

**{¶ 48}** This court has not recently addressed the elements which must be proved in order to pierce the corporate veil. See Presser, *supra*, Section 2.36. *North v. Higbee Co.* (1936), 131 Ohio St. 507, 6 O.O. 166, 3 N.E.2d 391, involved an attempt to hold a parent corporation liable for the debts of its subsidiary on the ground that the subsidiary was an agent of the parent. A majority of the court flatly rejected the agency theory. It held that proving a mere agency relationship between the parent and its subsidiary was insufficient and that absent an affirmative showing of fraud, the subsidiary's corporate veil could not be pierced in order to hold the parent liable. The syllabus stated in part:

"The separate corporate entities of a parent and subsidiary corporation will not be disregarded and the parent corporation will not be held liable for the acts and obligations of its subsidiary corporation, notwithstanding the facts that the latter

18

was controlled by the parent * * * *in the absence of proof that the subsidiary was formed for the purpose of perpetrating a fraud and that domination of the parent corporation over its subsidiary was exercised in such manner as to defraud complainant*." (Emphasis added.)

**{¶ 49}** *North* thus required a party seeking to pierce a corporate veil to prove two essential facts: (1) that the corporation was formed in order to perpetrate a fraud, and (2) that the shareholder's control of the corporation was exercised to defraud the party.

**{¶ 50}** We believe that the first prong of the *North* test no longer reflects the realities of modern corporate life. The requirement that a corporation be *formed* in order to perpetrate a fraud is simply too strict. The ease with which close corporations and corporate subsidiaries can be created and the ability to transfer ownership of an existing corporation leads us to believe that corporations formed for legitimate purposes can easily be later used to commit fraud or other wrongs. Moreover, it seems that in practice it would be unreasonably difficult to prove that any corporation was actually *formed* in order to perpetrate a fraud.

**{¶ 51}** In finding that RERC's corporate form could be ignored and Ronald Roark could be held individually liable, the court of appeals below did not follow *North*. Instead, it followed the opinion of the United States Court of Appeals for the Sixth Circuit in *Bucyrus-Erie Co. v. Gen. Products Corp.* (C.A.6, 1981), 643 F.2d 413. In *Bucyrus-Erie*, the Sixth Circuit applied Ohio law in reviewing jury instructions in a veil-piercing case. It held that the corporate form may be disregarded when "(1) domination and control over the corporation by those to be held liable is so complete that the corporation has no separate mind, will, or existence of its own; (2) that domination and control was used to commit fraud or

wrong or other dishonest or unjust act, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong."[8] *Id.* at 418.

{¶ 52} One factor recognized by the Sixth Circuit, that the shareholder's domination of the corporation was used to commit fraud or another wrong, was part of the *North* test. The Sixth Circuit also explicitly articulated two elements that we believe were implicit in *North*: the plaintiff must show that the corporation is so dominated by the shareholder that it has no separate mind, will, or existence of its own, and that injury or unjust loss resulted from the shareholder's control of the corporation. See *North*, *supra*, at 524-527, 6 O.O. at 173-175, 3 N.E.2d at 397-399. The first element is a concise statement of the alter ego doctrine; to succeed a plaintiff must show that the individual and the corporation are fundamentally indistinguishable. The second element is the requirement that the shareholder's control of the corporation proximately caused the plaintiff's injury or loss. Both are fairly obvious, but necessary, preconditions to recovery under the alter ego doctrine.

{¶ 53} We feel the Sixth Circuit's approach to piercing the corporate veil strikes the correct balance between the principle of limited shareholder liability and the reality that the corporate fiction is sometimes used by shareholders to protect themselves from liability for their own misdeeds. Thus, the corporate form may be disregarded and individual shareholders held liable for corporate misdeeds when

---

8. As a result of *Bucyrus-Erie*, two irreconcilable lines of cases have developed in the lower Ohio courts. Some Ohio courts of appeals have followed *North* in requiring that fraud in formation must be established. See *Wakefield v. First Bank Natl. Assn.* (1989), 62 Ohio App.3d 737, 577 N.E.2d 434; *Talbott v. Columbus & Southern Ohio Elec. Co.* (Oct. 9, 1987), Meigs App. No. 383, unreported; *Union Enterprises, Inc. v. Garland* (Dec. 11, 1986) Franklin App. No. 86AP-612; *Sedgwick v. Kawaski Cycleworks, Inc.* (1985), 24 Ohio App.3d 109, 24 OBR 179, 493 N.E.2d 308; *Suburban Nursing & Mobile Homes, Inc. v. Intra-City Enterprises, Inc.* (Apr. 14, 1983), Franklin App No. 82AP-111, unreported. Other courts of appeals, however, have relied on *Bucyrus-Erie* and held that a finding of fraud in formation is not necessary. See *Pioneer Heating & Air Conditioning, Inc. v. Elbert* (June 3, 1987), Lorain App. No. 4027, unreported; *Saeks v. Saeks* (1985), 24 Ohio App.3d 67, 24 OBR 122, 493 N.E.2d 280; *Crownover Lumber Co. v. Heath Pallet Co.* (May 20, 1985), Vinton App. No. 414, unreported.

(1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

{¶ 54} We hold that the Association did not introduce sufficient evidence to pierce RERC's corporate veil and reach Roark individually. The Association did not introduce any evidence that Roark used his control over RERC in such a manner as to defraud the Association. Neither the trial testimony presented by the Association nor the stipulations agreed to by the parties even suggested that Roark, personally, used his influence to defraud or injure the Association or its members. The evidence cited by the court of appeals below clearly shows that Roark did exercise control over RERC, but mere control over a corporation is not in itself a sufficient basis for shareholder liability. The judgment of the court below as to Roark's individual liability was not supported by competent, credible evidence and, therefore, must be reversed.[9]

IV

{¶ 55} The judgment of the court of appeals is reversed. This cause is remanded to the Court of Common Pleas of Hamilton County with instructions to issue judgment in favor of Ronald E. Roark on all claims by the Association and in favor of RERC on the Association's claim for breach of fiduciary duty. The court

---

9. Again in response to the dissent's criticism that we are guilty of reweighing the evidence, we must respond by stating that we have not in any way attempted to balance the evidence for and against Roark's individual liability. The standard of review for sufficiency of the evidence was stated in *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus: "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." We have found that evidence supporting one essential element of the test for piercing the corporate veil is not to be found in the record. The missing element was a showing that *Roark* controlled the corporation in order to defraud the Association. In light of this omission, we had no choice but to reverse.

must also consider whether RERC, in its capacity as general partner in Bellhill, complied with R.C. 5311.26(D) by "fully and accurately" disclosing its interest in the common areas of the condominium development through "a readable and understandable written statement of such circumstances." If the court finds against RERC, it must calculate damages in light of R.C. 5311.27(B) for those unit owners who purchased condominiums from Bellhill prior to the time Bellhill sold out of the Belvedere in 1983.

*Judgment reversed*
*and cause remanded.*

MOYER, C.J., A.W. SWEENEY, F.E. SWEENEY and PFEIFER, JJ., concur.

DOUGLAS and RESNICK, JJ., separately dissent.

_____

**DOUGLAS, J., dissenting.**

{¶ 56} I respectfully dissent. This case was tried to the court. A distinguished and thoroughly competent trial court judge, Judge Gilbert Bettman, heard the case, weighed the evidence, determined issues of law presented and wrote a well-reasoned, lengthy opinion letter deciding the case. A thoughtful and also thoroughly competent panel of judges of the First District Court of Appeals, Presiding Judge Doan, Judges Klusmeier and Hildebrandt, reviewed the judgment of the trial court and, in an exhaustive twelve-page opinion, unanimously affirmed the trial court. A reading of the opinions of both the trial court and the court of appeals reveals that both courts carefully reviewed the evidence, met their mandates to weigh evidence and review alleged errors of law and entered their judgments accordingly.

{¶ 57} Notwithstanding the foregoing, the majority, in a prolix opinion, reverses the judgment of the court of appeals (and that of the trial court). In doing so, the majority says such things as: "It [the court of appeals] specifically found that the evidence adduced at trial supported all five elements of common-law fraud

22

* * *"; "* * * the Association did not introduce sufficient evidence to pierce RERC's corporate veil and reach Roark individually"; and "[t]he judgment of the court below as to Roark's individual liability was not supported by competent, credible evidence * * *."

{¶ 58} Clearly, the majority has, in order to arrive at its predetermined judgment, reweighed the evidence and substituted its judgment for that of the court of appeals. At best, this seems strange, given R.C. 2503.43, which provides that "[i]n a civil case or proceeding, except when its jurisdiction is original * * *, the supreme court need not determine as to the weight of the evidence." In *Chemical Bank of New York v. Neman* (1990), 52 Ohio St.3d 204, 207, 556 N.E.2d 490, 494, we said that "[t]his court is not required to determine the weight of evidence in civil matters, R.C. 2503.43, and *ordinarily will not do so. State, ex rel Kobelt, v. Baker* (1940), 137 Ohio St. 337, 18 O.O. 521, 29 N.E.2d 960." (Emphasis added.) There seems to be no good reason in this case to violate this sound rule.

{¶ 59} In addition, and conveniently, the majority misses the whole point of the opinions and judgments of the court of appeals and the trial court. That point is that at the time the lease in question was entered into, the Association was controlled by Bellhill, which was controlled by RERC, which was controlled by Roark. This interlocking control and inside dealing, which resulted in a lease that is generally conceded to be unfair to the Association, brought both lower courts to their assessments of individual, joint and several liability. To ignore this "control" factor is to ignore reality.

{¶ 60} Further, the majority announces that for there to be a fiduciary duty between a developer (builder) and a condominium owners' association (owners-consumers), there must be an "understanding" by both parties that special trust and confidence have been reposed in the developer (builder). It should come as no surprise that the majority gives no citation for this new and very broad proposition. Let all who will, henceforth, enter into a construction agreement with a developer-

builder now be aware that they should get, carved in stone, an "understanding" that they can have trust and confidence in their builder to be honest with them.

{¶ 61} Finally, the majority says that "[w]hen an issue of law that was not argued below is implicit in another issue that was argued and is presented by an appeal, we may consider and resolve that implicit issue." This is also curious, given the statement that "[t]his court, however, is constitutionally limited to deciding only issues directly presented by an individual case." *Gallimore v. Children's Hosp. Med. Ctr.* (1993), 67 Ohio St.3d 244, 260, 617 N.E.2d 1052, 1063 (Wright, J., dissenting). It appears that some would have this court's jurisdiction to decide a question depend on whose "implicit issue" is being gored.

{¶ 62} I respectfully dissent.[10]

––––––––––––––––––

**ALICE ROBIE RESNICK, J., dissenting.**

{¶ 63} I am troubled by the degree of control appellant Roark exercised in "negotiating" the lease at issue. Apparently, Roark (acting as lessor through a partnership he controlled) essentially negotiated a lease, covering the common commercial areas of the Belvedere, with himself (acting through a company he controlled) as lessee. It is not particularly surprising that the lease terms were very favorable to the lessee Roark, because the Association (not lessor Roark) was the owner of the common areas. What is surprising is that the majority apparently sees no problem with lessor Roark acting in this manner. Through this transaction, Roark's conduct evinces violations of basic duties of good faith and fair dealing. Consequently, I dissent.

––––––––––––––––––

10. This dissent was written before the majority decided to add footnotes which are now numbered 5 and 9. The fact that the majority felt the necessity to respond to the dissent makes the point even more strongly, perhaps, than the dissent itself. Just as interesting is the fact that while amending the majority opinion, the majority did not also respond to the point that it is deciding an issue that was not decided by the court of appeals and, thus, is not before this court. Silence, in this case, is obviously an admission.

{¶ 64} The relationship between a condominium association and a developer may not be a *general* fiduciary one (*e.g.*, when a developer sells a condominium to a buyer, the sale is clearly an arm's-length transaction); however, the developer does owe some fiduciary duty to purchasers of condominiums. To my mind, the leasing of common areas is one situation where a developer should not be able to take advantage of his or her status as a developer to negotiate one-sided terms. A condominium association should be able to expect that the condominium developer will not seek self-enrichment by exploiting the members of the association in this way. The law of *caveat emptor*, which applies to arm's-length real estate transactions, should not apply to the lease of the common areas of a condominium development under the circumstances presented by this case. I cannot accept the majority's determination that R.C. Chapter 5311 essentially gave appellants free rein to set the lease terms however they saw fit.

{¶ 65} Although this case has aspects of fraud as well as violation of a fiduciary duty, it should not really be pigeonholed as either. It seems unnecessary to force appellee to prove all the elements of a common-law fraud. Likewise it seems unnecessary to force appellee to demonstrate that appellants owe the Association a strict *general* fiduciary duty before appellants can be found to have taken unfair advantage of appellee. I cannot believe that the legislature, when it allowed the condominium developer to take control of the owners' association in the early stages of the development by enacting R.C. 5311.08, contemplated that the developer would self-deal in this way with impunity. Yet the majority holds that R.C. Chapter 5311 insulates appellants from common-law liability. Even if the majority is correct in its assertion that "R.C. 5311.08 essentially *requires* self-dealing by developers during the early years of the development" (emphasis *sic*), I cannot accept the premise that R.C. Chapter 5311 condones the type of self-dealing of this case.

**{¶ 66}** Sufficient evidence was presented at trial to demonstrate that appellants violated some type of fiduciary duty owed to appellee, regardless of the label attached to that duty. Appellee, through expert witness testimony, established at trial that the terms of the lease were grossly unfair to appellee (particularly in light of the terms of the subleases subsequently negotiated by appellants). Moreover, a presumption of bad faith was raised, which appellants have not overcome. Thus, competent, credible evidence supported the trial court's determination that (to use the trial judge's words) "there is something 'rotten in Denmark.'" The trial court also realized that the evidence indicated conclusively that Roark personally was responsible for creating the smell. The court of appeals recognized the patent unfairness engendered by Roark's bad faith and affirmed the trial court's judgment. I would affirm the judgment of the court of appeals.

_____