[Cite as *Ossco Properties, Ltd. v. United Commercial Property Group, L.L.C.*, 197 Ohio App.3d 623, 2011-Ohio-6759.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 96790

---

## OSSCO PROPERTIES, LTD.,

APPELLEE,

v.

## UNITED COMMERCIAL PROPERTY GROUP, L.L.C.,

APPELLANT.

---

### JUDGMENT:
### AFFIRMED IN PART AND
### REVERSED IN PART

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-733590

**BEFORE:**   Celebrezze, J., Stewart, P.J., and Boyle, J.

**RELEASED AND JOURNALIZED:**   December 29, 2011

**ATTORNEYS:**

Thomas M. Horwitz Co., L.P.A., and Thomas M. Horwitz; and McIntyre, Kahn & Kruse Co., L.P.A., Isis C. Filipek, and Scott H. Kahn, for appellee.

Schottenstein, Zox & Dunn, L.P.A., and Jay E. Krasovec, for appellant.

FRANK D. CELEBREZZE JR., Judge.

{¶ 1} Appellant, United Commercial Property Group, L.L.C. ("UCPG"), through its managing member, Mark Escaja, brings the instant appeal of a judgment in favor of appellee, Ossco Properties, Ltd. ("Ossco"), for $769,707.17 and $144,095.34 in prejudgment interest. UCPG argues that the trial court's decision is against the manifest weight of the evidence. After a thorough review of the record and apposite law, we affirm the judgment in part and reverse it in part.

{¶ 2} In 2004, Escaja and the managing member of Ossco, Jerome Osborne III, formed UCPG, whose primary business was the development and sale of commercial real estate. Ossco obligated itself to supply up to $750,000 in loans to UCPG to fund the operation of the business. The loans were to accrue interest at the federal prime rate plus one percent. According to the UCPG Operating Agreement, Ossco and Escaja were both managing members of UCPG. Escaja was to run the day-to-day operations of the business and receive a monthly management fee of $10,000 for the first year of operation. Ossco was to maintain UCPG's checking account and manage the finances. An Ossco employee, Timothy Posar, generally handled the payment of invoices and accounting.

Escaja or his office manager would mail or fax bills they received to Posar, who would pay them from UCPG's account. If sufficient funds did not exist in the account to cover the debts, Ossco would deposit funds to cover those and future expenses. From the bank records, financial statements, and testimony, it appears that UCPG's sole source of income was the Ossco loans.

{¶ 3} Escaja attempted to cultivate various "big box" commercial-development deals that did not come to fruition, and the relationship between Escaja and Ossco's managing member, Osborne, became strained in 2008. Escaja and Osborne exchanged correspondence in which Osborne indicated that he would no longer lend money to UCPG or pay Escaja's management fee, and Escaja threatened legal action. Ossco did continue to make smaller loans to UCPG and to pay some expenses, except the management fee, through 2008. It made one large loan at the end of the year, from which it took a hefty interest payment and a fee for accounting services back to itself. On July 20, 2010, Ossco calculated the outstanding loan balance to be $769,707.17 and $144,095.34 in accrued interest. It then demanded repayment.

{¶ 4} On August 5, 2010, Ossco filed suit, seeking judgment in the amount of the principal and accrued interest, plus further interest on the outstanding principal calculated at the prime rate plus one percent. The complaint failed to list a cause of action, but the trial court interpreted it to be an action for breach of contract, and a bench trial commenced on March 31, 2011. The trial court found that Ossco was owed $769,707.17 in principal, plus outstanding interest in the amount of $144,095.34. UCPG then filed this appeal, raising one error:

**{¶ 5}** I. "The trial court's April 14, 2011 journal entry is against the manifest weight of the evidence."

## Law and Analysis

### Manifest Weight

**{¶ 6}** UCPG first argues that the trial court's decision is not supported by competent, credible evidence where Ossco improperly deducted loan amounts from its total loan obligation of $750,000 for expenses not attributable to UCPG or the loan balance.

**{¶ 7}** It is well established that when some competent, credible evidence exists to support the judgment rendered by the trial court, an appellate court may not overturn that decision unless it is against the manifest weight of the evidence. *Seasons Coal Co., Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273. The knowledge a trial court gains through observing the witnesses and the parties in any proceeding (i.e., by observing their demeanor, gestures, and voice inflections and using these observations in weighing the credibility of the proffered testimony) cannot be conveyed to a reviewing court by a printed record. *In re Satterwhite* (Aug. 23, 2001), Cuyahoga App. No. 77071, 2001 WL 1001017, citing *Trickey v. Trickey* (1952), 158 Ohio St. 9, 13, 106 N.E.2d 772. In this regard, the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct. *Seasons Coal Co.* As the Ohio Supreme Court has stated, "It is for the trial court to resolve disputes of fact and weigh the testimony and credibility of the witnesses." *Bechtol v. Bechtol* (1990), 49 Ohio St.3d 21, 23, 550 N.E.2d 178.

{¶ 8} UCPG argues that a significant portion of the loan balance was improperly paid for expenses of separate businesses that were not incurred as the ordinary business expenses of UCPG. It claims that $116,713.47 was gratuitously paid and should not be counted toward the loan balance.

{¶ 9} The operating agreement provided for the payment of operating expenses in Paragraph I(G). This provides, "In the event that [UCPG] requires from its members any additional Capital Contributions or loans to fund [UCPG's] operations, [Ossco] shall be obligated to loan up to a maximum of Seven Hundred Fifty Thousand Dollars ($750,000.00) to [UCPG]."

{¶ 10} Posar, an employee of Ossco, testified that with little exception, invoices from those providing goods and services to UCPG were sent to UCPG's separate office in Solon, Ohio. Escaja or his office manager would then code the invoices for accounting purposes and send them to Ossco for payment. The parties operated in this way for a number of years, with Escaja receiving monthly and yearly statements that included the balance of the Ossco loans. Escaja testified that he never approved invoices for goods or services rendered to other businesses for payment by UCPG. However, Ossco produced at least one invoice on which Escaja had initialed an outstanding balance, indicating that it was to be paid by UCPG and coded by his office manager accordingly, even though it was for services rendered on behalf of a separate business entity. This supports Posar's testimony that UCPG acted as a hub in providing necessary funding for the development of real estate projects of various separate but related business entities established for individual projects, all radiating from UCPG and managed by Escaja. If those projects

were successful, UCPG would then recoup its expenditures plus a profit from them. This evidence demonstrates that these invoices were paid as normal business expenses of UCPG.

{¶ 11} The trial court did not err in attributing these payments to the Ossco loan balances when Escaja submitted them for payment in the ordinary course of business and expected Ossco to provide capital to cover them. UCPG or Escaja did not object when the expenses were paid. This at least constitutes consent by Escaja. The trial court found that "Ossco offered credible evidence that it paid these bills upon Escaja's request. Each bill went through Escaja or his office staff to Ossco for payment. If Escaja thought they were UCPG expenses at the time they were incurred, it is not credible now to say he was wrong." This determination is supported by competent, credible evidence.

{¶ 12} UCPG also argues that the loan balance was artificially inflated by accounting fees Ossco charged to UCPG in 2008. The operating agreement called for members to receive monthly and yearly accounting reports. Ossco had, in the past, prepared these reports without billing UCPG, but in 2008 charged $4,200 a year for accounting services rendered to UCPG, for a total of $16,800. These accounting services—paying UCPG's bills, maintaining its books, preparing monthly and yearly accounting statements, and assisting in the preparation of federal and state tax returns—were required for the operation of UCPG, and the trial court did not err in finding that they were done in the ordinary course of business and payable under Paragraph I(G)

without a vote of the members or other special action.[1] The operating agreement, in Paragraph IV(C)(iv), also specifies that expenses incurred in the ordinary course of business do not require a vote of all the members.

{¶ 13} Here, the accounting fees were for necessary services rendered on behalf of the company entitling Ossco to reasonable compensation for their provision. The trial court determined that $4,200 per year for accounting services was reasonable given the amount of bookkeeping work done by Ossco. That decision is supported in the record.

{¶ 14} However, the payment of interest in the amount of $26,700 in December 2008 was not an ordinary business expense of UCPG. Posar testified that no other interest payments were ever made to Ossco. While the operating agreement called for interest to be paid on the Ossco loans, it did not establish a payment schedule or otherwise indicate when payments were to be made. The trial court categorized the payments as purely an accounting transaction where money went into one account and then immediately back out. The transaction appears to have occurred only to increase the loan balance to ensure that it was at least $750,000.

{¶ 15} There is no evidence that the interest payment of $26,700 occurred as an ordinary business expense, because Ossco had never before received a payment from UCPG for the outstanding loans, and Escaja testified that he never approved such an interest payment. This payment also places Ossco ahead of UCPG's other creditors and

---

[1] Paragraph IV(F) also entitles members to reimbursement "for reasonable expenses incurred on behalf of [UCPG] * * *."

could constitute a conflict of interest, requiring a vote of all the members, according to Paragraph IV(C)(v).[2]

{¶ 16} Therefore, this interest payment should be deducted from the principal owed to Ossco, because it constitutes an act done without authority under the operating agreement. Such a payment requires the agreement of the members, because it was not an ordinary business expense and could constitute a potential conflict of interest, as set forth in Paragraph IV(C)(v). The amount of principal should be reduced by $26,700, but the amount of outstanding interest may be properly increased by the same amount. This would seem to make no difference except that the trial court's order imposes interest on the outstanding principal only. Therefore, the trial court's decision improperly ordered UCPG to pay interest on $26,700 that it would not otherwise be obligated to pay.

{¶ 17} Escaja also claims that his monthly management fee, paid to a business entity he controlled, should not be counted against the balance of the Ossco loans. He argues that if his management fees were included in the loan balance, he would, in essence, be working for free because he would have to pay that amount back to Ossco if UCPG made a profit.

{¶ 18} However, Escaja knew that there was no income other than loans from Ossco, and he still accepted those payments without question. Escaja claims that the provision obligating UCPG to pay a management fee was in a separate provision of the operating agreement from the payment of business expenses. The trial court found that

_____

[2] This provision requires a vote of the members to "authorize a transaction involving an actual or potential conflict of interest between a Member and the Company[.]"

this argument lacked merit because UCPG had no other source of income, and the payment of a management fee to operate the business was an ordinary business expense. That determination is supported by competent, credible evidence.

{¶ 19} UCPG argues that it is entitled to a set off from the sale of its rights in a purchase agreement to Green Madison, L.L.C. ("Madison"), an entity partially owned by Osborne, the managing member of Ossco.

{¶ 20} The right to set off one judgment by another is "at the court's discretion, which must be exercised in accordance with sound principles of equity jurisprudence." *Montalto v. Yeckley* (1944), 143 Ohio St. 181, 183, 54 N.E.2d 421, citing *Diehl v. Friester* (1882), 37 Ohio St. 473; *Barbour v. Natl. Exchange Bank of Tiffin* (1893), 50 Ohio St. 90, 33 N.E. 542. "In the case of *Andrews v. State ex rel. Blair, Supt. of Banks* [(1931)], 124 Ohio St. 348, 178 N.E. 581, * * *, this court held: 'A set-off, whether legal or equitable, must relate to cross demands in the same right, and when there is mutuality of obligation.' This was quoted with approval in the case of *Witham v. South Side Building & Loan Association of Lima* [(1938)], 133 Ohio St. 560, at page 562, 15 N.E.2d 149. In 36 Ohio Jurisprudence, 556, it is said: 'It is well settled that, as a general rule, mutuality of the parties is an essential condition of a valid set-off or counterclaim. That is, the debts must be to and from the same persons and in the same capacity. * * * To have the required mutuality, a set-off, whether legal or equitable, must relate to cross-demands in the same right and capacity.' " *Nichols v. Metro. Life Ins. Co.* (1941), 137 Ohio St. 542, 545, 31 N.E.2d 224.

{¶ 21} There is no mutuality between the parties in the present case and the transaction from which UCPG claims its right to a set off. The evidence at trial showed that Ossco was not a member of Madison. Separate litigation involving the Madison transaction was pending in Lake County at the time of trial. Further, no evidence exists indicating that UCPG should be allowed to hold Ossco liable for this transaction. The trial court found that "Ossco is not a member of [Madison] and, although Osborne may be connected to [Madison] in some fashion, there is no evidence justifying piercing the corporate veil to make Osborne, much less Ossco, liable for [Madison's] debt."

{¶ 22} Generally, in order to disregard the protections afforded by corporate or limited-liability business forms, one must show "(1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong." *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.* (1993), 67 Ohio St.3d 274, 617 N.E.2d 1075, paragraph three of the syllabus. UCPG has shown none of these required elements. Accordingly, UCPG is not entitled to a set off in the present case.

## Conclusion

{¶ 23} Ossco is entitled to the return of its money, plus interest, in accordance with the operating agreement binding the parties. At trial, Ossco established entitlement to the majority of the judgment issued by the trial court. However, the interest payment it made

to itself constituted a transaction for which majority member approval was required. The trial court's decision finding otherwise was against the manifest weight of the evidence. Therefore, the amount of the interest payment, $26,700, should be deducted from the outstanding principal balance of $769,707.17 and added back to the outstanding accrued interest of $144,095.34. The judgment of the trial court is affirmed in all other respects.

{¶ 24} The judgment is affirmed in part and reversed in part, and the cause is remanded to the lower court for further proceedings consistent with this opinion.

Judgment accordingly.

STEWART, P.J., and BOYLE, J., concur.

_____