Defendants-appellants Budget Systems and Rich Liss appeal the trial court's decision granting judgment to the plaintiff-appellee Sintel, Inc. After a trial to the bench, the court issued its opinion and order. The court entered judgment for the appellee for the sum of $16,335.00. The appellee filed this action on an account and sought damages for breach of contract. The dispute arises out of appellants order for binder bins, office furniture, from the appellee. Essentially, the appellants argue that the bins were non-conforming goods which were rejected and/or revoked. The appellee asserts that the bins were manufactured as ordered.
Sintel, Inc. is a custom metal fabricator which makes over 4,000 different parts for 140 different customers (T. 84). The president of Sintel is Dennis Dornbrush. Appellant Budget Systems is in the office refurbishing industry. Rich Liss testified that he operated Budget Systems. The appellant ordered 256 binder bins from the appellee at a cost of approximately $60.00 per bin. Binder bins are attached to an office furniture panel. These panels are manufactured by several major companies, including Steelcase and Haworth. The appellee contracted to custom fabricate these binder bins for the Budget Systems.
Rich Liss and his wife Becky Liss visited the appellee's plant to look at their products. At that time they were shown a Haworth prototype of a "flipper door unit" which is a binder bin with a door that flips up over the top of the unit when it is opened. On October 1, 1993, the appellants placed an order for the bins with locks, and ordered the merchandise to be shipped unpainted. The appellants asserted at trial that the bins viewed at the appellee's facility and subsequently ordered were units whose door opens to the inside of the bin.
Upon receipt of the purchase order, the appellee faxed the appellant, questioning the order for unpainted units. Sintel received a telephone call from Budget Systems indicating that they wanted the units unpainted. Since the binder bins were to be attached to panels, the appellee subsequently sent a letter requesting dimension specifications. In 95 to 98% of its business, Sintel manufactures a product by using prints given by the purchaser (T. 85). A telephone call was received from Mr. Liss indicating that the latest version of the Steelcase 9000 and the Steelcase movable wall should be used. Dornbush testified that the binder bin shown to Liss was the binder bin shipped to Budget Systems (T. 74).
The job was completed in mid December 1993. Budget Systems was contacted and sent a truck to pick up one-third of the units on December 22, 1993. The rest was shipped. In the middle of January 1994, Liss contacted Dornbush. As a result, Budget Systems paid for Dornbrush to visit Cleveland and examine the binder bins at the warehouse. During this visit, most of Dornbrush's time was spent with Liss, but Paul Ward, an employee of the appellant, was present for a few minutes.
Dornbush observed the employees improperly cleaning and painting the units. The appellant had also altered the panel to which it was attempting to attach the units. The appellants had placed fiberglass across the front, approximately 1 1/2 inches thick, and had wrapped it with fabric (T. 28). This made installation of the units difficult. The appellant wanted the edges of the units smoothed out instead of sharp and wanted the units painted.
As a result of this meeting, the appellee agreed to properly prepare the bins for painting, round the back edges, and make new clips for mounting. The freight was to be paid by Budget Systems. This agreement was memorialized in a letter from Dornbush to Liss. The bins were to be painted by a separate company partially owned by Dornbush. Subsequently, approximately 175 of the units were shipped back to Michigan for painting. The record also contains a letter from Dornbush to Mr. Ward with an address for shipping.
The bins were shipped and the painting was completed on Feb. 10, 1994. The appellee contacted the appellants for shipping instructions and was told that the appellants did not want the product returned (T. 35). The bins were shipped to the appellee's plant and placed in storage. Up until this point the appellee had no indication that the appellant would not accept the product. Dornbush made numerous attempts to contact Liss, but Liss would neither accept nor return his telephone calls. He was given the name of Paul Ward as someone to contact to resolve the problem.
In mid April 1994, after several telephone calls, Ward and Mike Grady went to visit the appellee's plant in Michigan. These two men believed they could persuade Liss to accept the product. Dornbush testified that he was told by Ward and Grady that Budget Systems had cash flow problems and requested that payment be made in two installments. This was reduced to writing by Dornbush and sent to Liss in the form of a letter with a space for his signature at the bottom. Liss never signed the letter. Dornbush telephoned several times, but in August or September 1994 was told by Ward that Liss would not accept the product. Ward indicated that Liss had purchased other product.
The bins ordered by Budget Systems were stored on the Sintel lot in storage trailers. The storage company is notorious for mailing invoices which are incorrect and for mailing the invoices late (T. 60). Sintel never paid any of the finance charges and did not pay the amounts which were billed, but not incurred by Sintel (T. 60).
Dornbush explained that the manufacturers of office furniture, such as Haworth, Steelcase, Trendway, and Herman Miller, distribute their products through dealers. Sintel has contracts with the manufacturers for modifications of their products. Dornbush testified that Sintel could not resell the unused Budget Systems binder bins to the dealers without losing its contracts with all of the manufacturers (T. 81, 82). Since he made the decision to stay in business, the only option available was to sell the bins to a refurbisher. A refurbisher is a company which obtains office furniture from business discarding their furniture. This furniture is then repainted or, recovered and then sold. Dornbush obtained two estimates from refurbishers as to the price they would give for the unused bins. Dornbush testified that a refurbisher will pay 10 or 11 cents on the dollar for the products it purchases (T. 42). A Haworth unit would sell for $129.60, discount included, and a Steelcase unit would sell for $125 with the discount.
Paul Ward testified that he had no authority to bind Budget Systems in a settlement of the account with Sintel. Although he traveled to Michigan and spoke with Dornbush, he never represented that he had the authority to settle the dispute. Ward also testified as to some of the difficulties Budget Systems had with the product manufactured by Sintel. Ward stated that the difference between what Budget Systems ordered, a unit having a door which opened inside the bin, and what was received, a unit with a door flipping over the top, was immense and that no one in the business would make such a mistake. Ward testified that units were not cleaned with gasoline and that Budget Systems does not keep gasoline at its facilities. Budget Systems had difficulty painting the units, the hooks received from Sintel were too shallow, and the units did not hang properly. Telephone calls between the two companies resulted in Sintel manufacturing larger hooks, but the hooks were not a standard size so some worked and some did not. The difficulty painting was just the beginning of the problems, the more the units were worked with, the more problems Budget Systems discovered. Ward testified that Budget Systems did not receive assembly instructions for the units. A telephone call was made to Sintel and assembly instructions were given over the telephone (T. 160). Ward did not remember whether or not he asked for written instructions.
When Dornbush was in Cleveland attempting to resolve the problems, Ward heard him admit that the product shipped was not the product shown in Michigan (T. 133). When Ward was in Michigan he saw the bin ordered by Liss sitting in a conference room. Ward testified that Dornbush stated that the unit was the one he had shown Liss, but that he was unable to manufacture it due to problems (T. 134-135). The unit in the conference room had a door which opened to the inside of the unit. Budget Systems exhausted its resources attempting to make the units manufactured by Sintel work. The units received by Budget Systems could not all be used. Ultimately, the company which purchased Budget Systems threw them away.
Ward testified that he did not know who had authority to bind Budget Systems, and he did not know who owned Budget Systems, but that Rich Liss was in charge and was one of the persons who gave him directions. Mary McCoy testified that she worked for Budget Systems, Inc. in February 1994. At that time Rich Liss was the president of the company.
Becky Liss testified that she is a space planner and a designer for Office Furniture Systems. Ms. Liss testified that she made the trip to Michigan to see the Sintel facility. The units shown in Michigan and ordered from Sintel did not match the one received by Budget Systems.
Ms. Liss stated that she was responsible for keeping the corporate books for Budget Systems. She testified on direct examination that Rich Liss has no role in running the business (T. 215), but that he works in sales. Budget Systems was never a sole proprietorship of Rich Liss. Rather, Budget Systems was a division of Budget Office Furniture or O.F.S. Installation Company Inc. (T. 215) which subsequently corporated separately (T. 216). Ms. Liss testified that she was the owner and president of the corporation O.F.S. Installation Company Inc. Tax returns were filed first under O.F.S. and later under Budget Systems.
On cross-examination, Ms. Liss was clear that Rich Liss was in charge of running Budget Systems, but also testified that he did not work for her (T. 223). Ms. Liss testified regarding the time prior to the incorporation of Budget Systems:
 A: Rich had a lot to do with the consultation of it. He told the salesmen. He helped the salesmen sell it.
Q: Lets talk about —
A: He did the buys.
 Q: Lets talk about the relationship between Rich Liss and Paul Ward as it relates to Budget Systems before it was incorporated. Who was in charge of Budget Systems at that time?
 A: Rich pretty well did the selling. Paul Ward did the technical part.
 Q: Was Rich — was Rich Liss in charge of operating Budget Systems? Yes or no.
A: Not completely.
 Q: So if Mr. Ward said that Rich Liss is in charge of running Budget Systems he's incorrect?
 A: I guess then Rich called the shots there. I guess that's what you're after.
Q: He was in charge of operating, wasn't he?
A: Yeah.
Q: Okay. Thank you.
A: People answered to him.
(T. 224-225).
Additionally, the trial court questioned Ms. Liss on the status of Budget Systems.
 THE COURT: All right. I have a couple. Can I see Exhibit 3, please. All right. What I'm trying to get straight here now is Budget Systems, which are identified in Exhibit 3 which of course you can look at you've probable seen these before the purchase order.
THE WITNESS: Mm-hmm.
THE COURT: It says Budget Systems.
 THE WITNESS: This one is dated October 1st of `93. What type of an entity was Budget Systems that ordered this particular group of bins from Sintel on October 1st of `93? What kind of an entity was it? Was it a partnership? Was it a proprietorship?
THE WITNESS: It was a corporation.
THE COURT: It was a corporation in October of `93?
THE WITNESS: Yes.
 THE COURT: You indicated, if I recall you're the president of the corporation.
THE WITNESS: Of —
THE COURT: — At that time.
THE WITNESS: Of O.F.S. Installation.
 THE COURT: All right. I'm Talking about Budget Systems because there is no O.F.S. on this purchase order.
THE WITNESS: Well, they had their own paperwork.
 THE COURT: Well, that's what I'm asking you. What was Budget Systems?
THE WITNESS: Its a separate corporation.
THE COURT: A separate corporation?
THE WITNESS: (Indicating.)
 THE COURT: Well, who was the president of Budget Systems in October of 1993? Who is the president?
 THE WITNESS: In the separate corporation Budget Systems would be — Rich Liss was the president.
THE COURT: The president?
 THE WITNESS: Before that I was the president of O.F.S. Installation Company who Budget Systems was a division of.
 THE COURT: All right. I understand you're the president of O.F.S.
THE WITNESS: Yes.
THE COURT: Did Rich Liss have a — an office in O.F.S.?
THE WITNESS: An Office in O.F.S.?
 THE COURT: Yeah. Usually you have more than one office. You were the president you said.
THE WITNESS: Right.
 THE COURT: Did Rich Liss have an office? Was he an officer of O.F.S.?
THE WITNESS: No.
(T. 227-230).
Ms. Liss further testified that Budget Systems began doing business half way through 1993 and was sold to K.M.R. Industries in 1995. At the time of this sale, K.M.R. assumed all of the debt of the corporation. After the incorporation of Budget Systems, Rich Liss was the president. Prior to the incorporation, Budget Systems was a division of O.F.S.
Rich Liss testified that there was an incredible demand for binder bins in the industry so that when he learned that a company in Michigan produced binder bins he made contact immediately and then arranged to see Mr. Dornbush. Subsequent to this visit a purchase order was made. The binder bin he was shown had a door that opened into the bin, not one that flipped up on top of the unit. He did not receive from Sintel the type of unit he ordered. At the time the units were received he was in desperate need of the units and attempted to make the units fit his needs. Budget Systems paid for Dornbush to travel to Cleveland. When Dornbush was shown the units he admitted that they were not what Liss had ordered (T. 253, 254).
Liss stated that he is a salesman and that Paul Ward, the person in charge of the manufacturing facility, kept trying to modify the units to make them usable. Finally, Ward conceded that they would not work.
Liss acknowledged that Budget Systems is no longer in business, but stated that all of the creditors were paid when the assets were sold. The refurbishing industry is cash driven. Ninety-five percent of the time the items they ordered were paid for before arrival at their facility.
When questioned on cross-examination as to who owned Budget Systems, Liss testified:
 Q: Mr. Liss, is it your testimony today that you owned and operated Budget Systems?
A: No.
Q: Who owned and operated Budget Systems?
A: Becky Liss owned it and I operated it.
Q: Who operated it?
A: Paul Ward did.
 Q: And at one point in time Budget Systems was incorporated. That's correct, isn't it?
A: I have no idea.
(T. 267). Later in the testimony, Liss reiterated that he operated Budget Systems and that Becky Liss was responsible for payables and for financing. On re-direct, Liss stated that Budget Systems was never a dba or a sole proprietorship of himself personally (T. 301). Ultimately, in order to clarify the testimony, the court questioned Rich Liss:
 THE COURT: Now, you indicated that in `93 and `94 you ran Budget Systems, correct?
THE WITNESS: Correct.
THE COURT: What was your title there, if any?
THE WITNESS: Not really. I just ran the company.
 THE COURT: And you have indicated that you had no idea, according to my notes here, whether or not Budget was ever incorporated? You don't know that?
THE WITNESS: Yes, I know the answer to that.
THE COURT: What is that?
THE WITNESS: It was.
THE COURT: When was it incorporated?
THE WITNESS: I have no idea.
THE COURT: When did Budget go out of business?
THE WITNESS: It never went out of business.
THE COURT: Did you sell it?
THE WITNESS: That's correct.
(T. 308-309).
Mr. Liss also testified that had he not given his approval, the unpainted binder bins would never have been ordered (T.270). Liss also admitted that he had no documents relating to the transaction with Sintel (T. 271). When Dornbush came to Cleveland there was some discussion as to how to make the product work, but that painting was never at issue. Liss stated that he had no idea whether or not the product was to be shipped back to Michigan for painting. He stated that the resolution of the problems and the painting of the units would have been handled by Paul Ward and that Ward had the authority to do so (T. 279). Liss testified that he did not remember the documents surrounding this deal and could not recall whether or not he received them. Other people in the organization would have handled the problems. Liss did not recall receiving the letter from Dornbush sent after Paul Ward made the trip to Michigan. He assumed that Ward would have responded to the letter (T. 290). Liss testified that he had no knowledge of whether or not Budget Systems paid for the painting of the units. He would not have had to authorize such an expenditure. Liss does not specifically know what happened to the units which were shipped to Budget Systems and never returned to Sintel.
The appellant asserts five assignments of error, the first and fifth of which will be considered together.
The first assignment of error:
 THE TRIAL COURT ERRED BY ENTERING JUDGMENT IN FAVOR OF SINTEL, INC., IN THE AMOUNT OF $16,335.00, BECAUSE THE EVIDENCE PRESENTED DURING TRIAL DEMONSTRATED THAT SINTEL INC., COMPLETELY FAILED TO MITIGATE ITS ALLEGED DAMAGES, AND ACTUALLY CREATED DAMAGES BY AND THROUGH ITS OWN ACTIONS.
The appellants fifth assignment of error:
 THE TRIAL COURT ERRED BY AWARDING DAMAGES IN THE AMOUNT OF $7,875.00 FOR UNSOLD GOODS BECAUSE THE MANIFEST WEIGHT OF THE EVIDENCE DOES NOT SUPPORT THESE DAMAGES.
For the sake of the first assignment of error, the appellants assume, arguendo, that the appellee was entitled to damages. Given this assumption, the appellants argue that the trial court failed to consider that, under Ohio law, the appellee was required to mitigate its damages. The next argument put forth by the appellants is that the court had no evidence upon which to base its order. In the fifth assignment of error, the appellant contends that the trial court's determination of damages was against the manifest weight of the evidence.
The Supreme Court has held that the law in Ohio is clear that an appellate court will not disturb the findings of the trier of fact unless they are against the manifest weight of the evidence.Landis v. Kelly (1875), 27 Ohio St. 567; State, ex rel. ShadyAcres Nursing Home, Inc. v. Rhodes (1983), 7 Ohio St.3d 7. Moreover, if the judgment of the trial court is supported by some competent, credible evidence, it will not be reversed by a reviewing court as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Construction Co. (1978),54 Ohio St.2d 279; Stevens Skin Softner Inc., v. Revco Drug StoreInc. (1997), 121 Ohio App.3d 212. Every reasonable presumption must be made in favor of the judgment and the findings of fact.Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77. If the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the trial court's verdict and judgment. White v. Euclid Square Mall (1995),107 Ohio App.3d 536.
This appellate court has held that mitigation of damages is intended to prevent an inclusion in the damage award of damages that could have been avoided by reasonable affirmative action by the injured party without substantial risk to such party.Czarnecki v. Basta (1996), 112 Ohio App.3d 418; S-Products, B.V.v. Noral, Inc. (Nov. 19, 1992), Cuyahoga App. No. 61347, unreported.
In the case sub judice, the trial court in its opinion noted that the parties agreed that the binder bin units averaged a value of $60 a unit. The court awarded the full contract price to the appellee for the 81 binder bin units shipped to and used, but not paid for, by the appellants. This portion of the award was $4,860.00. The court found that approximately 175 bins were in the possession of the appellee after the appellants shipped them back for repainting. For these units, the court cited Dornbush's testimony that, due to Sintel's relationship with the major manufacturers, the value of each unit today would be $15.00 per unit. The court subtracted $15.00 from $60.00 and found that the appellee suffered a $45.00 loss on each unit. The court awarded $7,875.00 for the units which were returned to the appellees. Thus, inherent in the trial court's calculation is a finding that the appellee was required to mitigate its damages and failed to do so. The trial court committed no error in this regard.
The appellants also argue that the court improperly arrived at a price per unit for the binder bins. The court received testimony from various witnesses regarding the current value of the bins. Dornbush stated the value of binder bins was $125 or $129.60, depending on the manufacturer. Mary McCoy testified the units, retail, may be sold for $520, and that a refurbisher would pay 30 to 35 cents on the retail dollar, or approximately $160.00. Allan DeFranco testified that manufacturers provide a 55% discount to their dealers by taking 50% of the list price and then 10% off of the remainder. He valued a binder bin at approximately $350.00 list price. A dealer would pay approximately $150.00 (T. 196).
Based upon this testimony, it appears that the court arrived at a base price for a binder bin of $150.00. The court then determined that the appellee was not required to go out of business in the process of mitigating its damages and found that the binder bins could only be sold to a refurbisher. The court had evidence supporting a determination that a refurbisher would pay 10 cents on the dollar, or $15.00 for a binder bin. The court had competent, credible evidence before it to support a decision on its findings.
The appellants' first and fifth assignments of error is overruled.
The second assignment of error:
 THE TRIAL COURT ERRED BY ENTERING JUDGMENT AGAINST RICH LISS BECAUSE THE EVIDENCE PRESENTED DURING TRIAL DEMONSTRATED THAT RICH LISS IS NOT A REAL PARTY IN INTEREST.
The appellants assert that the court erred in finding Rich Liss personally liable. The appellants argue that the record demonstrates that Rich Liss was not a sole proprietor, that Budget Systems was a dba or a division of another corporate entity, and that the evidence at trial indicated that the contract was with Budget Systems, not Rich Liss.
Essentially, the appellants urge this court to determine the status of Budget Systems at the time the contract was entered. The appellee argues that, because Liss was the owner and president of Budget Systems, Inc. during the execution of the contract, the corporate veil should be pierced and Liss held responsible.
The trial court questioned counsel for the appellants as to the legal status of Budget Systems:
 Now, what is your position on the legal entity Budget System that's in business, apparently doing — has their own stationery, their own checking system, their own checking accounts and the purchase order that's before the Court saying Budget Systems in October, on October the 1 of 1993? Now, apparently it's your indication this is not a — it's not a corporation. It's not a partnership. It's not a sole proprietorship. What is this legal entity that's sending out purchase agreements and everything else under the name of Budget System?
 Now, even if — you're saying it's a wholly-owned subsidiary of another corporation; is that your position?
(T. 345-346). In response, counsel for the appellants stated:
 There was and let me explain the problem. I did not realize that at the inception of the transaction Budget Systems, Inc. had not at that point been incorporated. It was incorporated in January of 1994. And I will stand before the Court and say to you that the fact that it was incorporated after this transaction doesn't affect anything. I admit that because I can't incorporate after the fact and say now you're stuck with the corporation. No dispute.
(T. 346-347). After further questioning, the appellants' counsel stated to the court:
 And I believe that when the company — when Budget Systems, Inc. was incorporated Mr. Liss was the owner of the corporation. He was confused on that, but I'm telling you he was the owner of that corporation and he was the president of that corporation.
(T. 348)
Counsel for the appellants represented to the court that even though the contract was entered into at a time when Budget Systems was unincorporated, the corporate entity assumed liability on the contract. Therefore, the trial court was entitled to determine whether or not the corporate veil of Budget Systems, Inc. should be pierced and Liss held personally liable for the breach of contract.
This court has held that one purpose of incorporation is to limit the liability of individual shareholders. Section 3, Article XIII of the Ohio Constitution. Therefore, the burden of proof is upon the party seeking to impose individual liability on the shareholder to demonstrate that the grounds for piercing the corporate veil exist. Univ. Circle Ctr. Corp. v. Galbreath Co. (1995), 106 Ohio App.3d 835, citing to LeRoux's Billyle SupperClub v. Ma (1991), 77 Ohio App.3d 417.
The test for piercing a corporate veil was determined inBelvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc. (1993), 67 Ohio St.3d 274, at syllabus 3, where the Supreme Court held:
 The corporate form may be disregarded and individual shareholders held liable for wrongs committed by the corporation when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.
The record demonstrates that Liss held complete control over Budget Systems. Liss unequivocally testified that he was the man making the decisions. For example, Liss testified that had he not given his approval, the unpainted binder bins would never have been ordered. On smaller transactions, other people in the company had responsibility, but Liss was the decision maker for major purchases (T. 273). Similarly, after Grady and Ward went to Michigan and attempted to work out a resolution of the dispute between the parties, the agreement could not be executed without the approval of Rich Liss. Since Liss would not return Dornbush's telephone calls, the problems were not resolved. Additionally, Paul Ward testified at trial that Rich Liss was in charge of the operation and gave directions to employees. Mary McCoy and Becky Liss both testified that Liss was the president of Budget Systems.
The record demonstrates that Rich Liss was in fact, Budget Systems, Inc. The corporation breached its contract with appellee at his direction and Sintel sought to recover from the loss which resulted from the actions of Rich Liss. The test set forth inBelvedere Condominium Unit Owners' Assn., supra, has been met. The trial court did not err in holding Rich Liss personally liable to the appellee.
The appellants' second assignment of error is overruled.
The appellants' third assignment of error:
 THE TRIAL COURT ERRED BY ENTERING JUDGMENT IN FAVOR OF SINTEL, INC., BECAUSE THE EVIDENCE PRESENTED DURING TRIAL DEMONSTRATED THAT SINTEL, INC., HAD DELIVERED NON-CONFORMING AND DEFECTIVE GOODS TO BUDGET SYSTEMS.
The appellants assert that four witnesses were presented testifying that the binder bins were defective and non-conforming. The appellants argue that the goods were rejected and/or revoked in a timely fashion under the applicable U.C.C. regulations and Revised Code sections. The appellee asserts that the binder bins were produced as ordered and that it made every attempt to correct the deficiencies brought to its attention.
The law pertinent to questions of manifest weight is set forth in the first assignment of error, supra. Generally, the court of appeals will not reverse the lower court's determination where the decision is supported by some competent credible evidence.C.E. Morris Co., supra.
Here, the trial court heard evidence that the binder bins were manufactured as ordered; that Dornbush traveled to Cleveland to discuss problems; that some of the bins were used by the appellants and never paid for; that some of the bins were shipped back to Sintel for painting; and that subsequent to the agreed painting of the bins, the appellee attempted to reach the appellants for shipment instructions, but Liss would not answer or return telephone calls. The trial court held in its opinion:
 In reviewing the evidence presented by the opposing parties in this case, this Court finds that the great weight of credible evidence supports [appellee's] version of events. If the binder bins manufactured by the [appellants] were as totally incompatible with the needs of Budget as was testified to at trial then it would be illogical for Budget to send the units back to the [appellee] for painting. In a fax transmittal from Dornbush to Rich Liss dated 1/21/94 Dornbush states that in conformance with discussions with Liss, Sintel agreed to the following changes to be made to the binder bins that had already been ordered:
 1. Powder coat all part in Steelcase gray value one;
 2. Round corners on the back edge of the doors; and
3. Provide new clips at a cost of $.83 each . . .
On future production Sintel will:
1. Paint all product;
2. Round corners on the back edge of all doors;
 3. Provide a panel lock on each unit to insure that unit is locked down to the panel; and
 4. Provide a new universal panel clip to fit all known Steelcase moveable wall panel rails. (See [appellee's] Exhibit 12).
 There was no mention in the fax transmittal of any problems that Budget was having with the binder bins door. Rich Liss testified that although he had no recall of seeing the transmittal from Dornbush he was unable to say that it was not received by Budget. Indeed Budget was unable to point to any documentary evidence throughout the course of the trial to substantiate its claim that it had put Sintel on notice that the binder bins failed to conform to the specifications agreed upon. Sintel, on the other hand, introduced a thorough history of correspondence between the parties which tends to indicate that Budget never rejected the binder bins in question and/or revoked acceptance after delivery because of problems with the units' doors.
(Trial court's opinion at 3-4).
A review of the record supports the trial court's conclusions. Since the decision was supported by the manifest weight of the evidence and was based upon competent, credible evidence, this court will not reverse.
The appellants' third assignment of error is overruled.
The fourth assignment of error:
 THE TRIAL COURT ERRED BY AWARDING DAMAGES FOR STORAGE FEES IN THE AMOUNT OF $3,600.00, BECAUSE THE MANIFEST WEIGHT OF THE EVIDENCE DOES NOT SUPPORT THESE DAMAGES.
The appellants state that the trial court's award of storage fees was against the manifest weight of the evidence. Specifically, the appellants argue that the evidence presented by Sintel on the amount of storage fees was not properly authenticated, that there was confusion as to the calculation of the fees, that the invoices and canceled checks do not match the amount claimed by the appellee or the amount awarded by the court, and that the court awarded storage fees without regard to the requirement of mitigation.
Once more, the appellants have set before this court a question of manifest weight. Exhibit 21, admitted at trial as a business record, provided the court with competent, credible evidence supporting its determination. Additionally, the court heard evidence that the finance charges and double billings for the storage were not paid by the appellee. Finally, the court awarded only $3,600 for storage, not the $8,900 requested by the appellee at trial. The trial court's decision was not against the manifest weight of the evidence.
The appellants' fourth assignment of error is overruled.
Judgment is affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Exceptions.
ANN DYKE, P.J., and LEO M. SPELLACY, J., CONCUR.
 ___________________________________ JAMES D. SWEENEY JUDGE