In re Alan A. MA, Debtor.

Elaine Mayher, Plaintiff,

v.

Alan A. Ma, Defendant.

Bankruptcy No. 05–94070.
Adversary No. 05–1584.

United States Bankruptcy Court,
N.D. Ohio,
Eastern Division.

Sept. 28, 2007.

cial, Inc., owned and run by the debtor-defendant Alan Ma, served as a mortgage broker for the plaintiff Elaine Mayher. Mayher filed a complaint in Ma's chapter 7 case asking that a debt owed to her by First Liberty be declared nondischargeable as against Ma individually under 11 U.S.C. § 523(a)(6). For the reasons stated below, the court finds that the corporate veil between First Liberty and Alan Ma should be pierced so as to hold the debtor liable for the First Liberty debt and that the debtor's liability on the judgment is nondischargeable under § 523(a)(6).

## JURISDICTION

Jurisdiction exists under 28 U.S.C. § 1334 and General Order No. 84 entered by the United States District Court for the Northern District of Ohio. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).[1]

Kathryn J. Carlisle–Kesling, Carlisle–Kesling & Adamczyk Co., L.P.A., Middleburg Hts., OH, for Plaintiff.

Stephen D. Hobt, Cleveland, OH, for Defendant/Debtor.

## MEMORANDUM OF OPINION

PAT E. MORGENSTERN–CLARREN, Bankruptcy Judge.

This dispute arises out of a refinancing transaction in which First Liberty Finan-

## FACTS[2]

### I. First Liberty

The debtor Alan Ma obtained his loan officer license from the State of Ohio in 1995. In 1998, he incorporated First Liberty Financial, Inc., a licensed mortgage brokerage firm, with $500.00 in assets.[3] Ma, who was First Liberty's sole shareholder and officer, admits that he con-

---

1. This case was filed before October 17, 2005, the effective date of most of the provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8, Stat. 23. All citations are, therefore, to the bankruptcy code as it existed before that date.

2. The parties submitted stipulations. *See* docket 97. Other facts were deemed admitted. *See* order at docket 29 (deeming each of Mayher's requests for admission admitted). The court held a trial on July 18, 2007. Mayher presented her case through her own testi-

mony, Ma's testimony, and exhibits. These findings reflect the court's weighing of the evidence, including determining a witness's credibility, "In doing so, the Court considered the witnesses' demeanor, the substance of the testimony, and the context in which the statements were made, recognizing that a transcript does not convey tone, attitude, body language, or nuance of expression." *In re The v. Companies*, 274 B.R. 721, 726 (Bankr. N.D.Ohio 2002).

3. Exh. 33, schedule L.

trolled First Liberty throughout its existence.[4]

First Liberty did not have a written operating agreement. The corporation did not maintain a record book, hold corporate meetings, or keep corporate minutes. Corporate resolutions (if any) were not produced during discovery or offered at trial. Ma was the sole signatory on First Liberty's business account, payroll account, and special trust account.

Ma did not have an employment agreement with First Liberty. He drew money from the corporation in two ways: (1) he received what he considered a wage, although it was not paid in a set amount or at regular intervals; and (2) from February 1999 through February of 2005, he received other payments totaling $73,554.50 for reasons that were not established at trial. First Liberty did not issue a W–2 or a form 1099 to Ma.

First Liberty had other employees from time to time. They got paychecks from First Liberty and, on occasion from May 4, 2003 to August 4, 2005, Ma wrote personal checks to them. Ma testified that he wrote these checks as loans to the employees until their payroll checks cleared. There were no corresponding promissory notes, loan agreements or ledgers reflecting these transactions and Ma did not charge the employees interest. At times, employees endorsed their First Liberty payroll checks to Ma, who deposited them in his personal account. Ma testified, without specifics, that this was either because he was cashing the check for the employee or because the employee was repaying a loan. Ma did not offer any evidence that correlated the checks he

wrote to the employees on his personal accounts with the checks endorsed over to him by the employees. The corporation also made cash advances to employees, although Ma could not explain why the cash advances sometimes came from First Liberty and at other times came from his personal account.

Ma acknowledged that he made loans to First Liberty, but he did not specifically recall them. He stated that in such situations he would have written a check to the corporation, deposited it in the corporate account, and reimbursed himself later if the corporation made money. He did not document these transactions by promissory note or otherwise.

At some point before December 2002, Ma hired Thomas Botz as a loan officer. Ma knew that Botz was not licensed as a loan officer when he hired him; Ma did not view this as a problem because Botz said that his application was pending. Ma did not follow up on this issue with Botz. In fact, Botz was never licensed as a loan officer and could not be so licensed because he had been convicted of grand theft in 1979 and 1991.[5]

Ma testified that he closed First Liberty in spring 2005, but did not employ any legal formalities. First Liberty did not adopt a corporate resolution of dissolution or notify the Ohio Secretary of State of the dissolution. The Ohio Secretary of State's records show that the corporation was in good standing with that office as recently as May 2007.[6] Ma continued to use First Liberty's American Express card after First Liberty stopped doing business. In May 2005, he used the card to pay for personal expenses, including buying jewel-

---

4. Ma trial brief at 6, docket 93.

5. A third conviction followed in 2004, after the date on which this dispute arose and unrelated to it.

6. Exh. 31.

ry and facilitating his move to new employment. Also, as noted above, he wrote a personal check on August 4, 2005 to cover an employee's First Liberty wages.

Although Ma does not consider himself to be liable for First Liberty's debts, he scheduled all of the corporate debt in his personal bankruptcy filing.

## II. Elaine Mayher's Refinancing Through First Liberty from December 2002 through March 2003

The plaintiff Elaine Mayher, age 67 at the time of the relevant events, owned several pieces of real estate, including her residence in North Royalton, Ohio (the residence), a motel, and some condominiums. Fifth Third Bank held a promissory note with a 7.75% interest rate secured by a mortgage on the residence. The note called for Mayher to pay $1,289.54 a month in principal and interest, plus an additional $223.34 which was placed in escrow for taxes and homeowners' insurance, for a total monthly payment of $1,512.88. By letter dated October 9, 2002, Fifth Third suggested to Mayher that she could refinance at a 6.55% annual percentage rate which would result in a monthly principal and interest payment of $ 1,131.37, thus saving $158.17 a month.

In December 2002, Mayher decided to follow up on this idea. She called First Liberty, which she understood could find the cheapest rate for her. Mayher spoke with Thomas Botz, who identified himself as a loan officer with First Liberty. Mayher told Botz that she wanted to refinance the Fifth Third note to lower her interest rate and monthly payments. Botz said that he could get a loan for her at a much lower rate (5%, plus or minus) through Countrywide Home Loans and/or America's Wholesale Lender (collectively, Coun-

trywide), which would lower her monthly payments.

Mayher gave Botz all of her financial information. She explained that in addition to her residence (with a loan balance of about $177,000.00), she owned real estate in Vermilion, Ohio which was encumbered by a $19,000.00 mortgage held by Upland Mortgage. Mayher made monthly payments of $192.99 on this obligation. She also owned several condominium units which she rented out. Her monthly income consisted of those rentals, together with income from trust investments valued at $500,000.00, and social security. Although Mayher intended just to refinance her residence, Botz convinced her that she could get a better rate and save money if she borrowed enough money to pay off the Upland mortgage at the same time.

On December 10, 2002, Botz met with Mayher at her residence. During the conversation, he told her that he was very experienced with loans. Botz brought with him these documents for Mayher to sign:

(1) *Uniform Residential Loan Application* [7]

The application stated that Mayher was seeking a conventional loan for $207,000.00 at a fixed rate of 5.625%. The application also stated that Mayher had $10,000.00 a month income (specifically stating that she had no rental income); no assets other than a car and household goods; and no real estate other than her residence. Mayher did not ask Botz about the missing information and he did not offer any explanation.

(2) *Retention Agreement* [8]

This form agreement recited that Mayher was retaining First Liberty to obtain a

---

7. Exh. 5.

8. Exh. 9.

mortgage loan for her. Paragraph 2 stated that Mayher agreed to pay First Liberty Inc. an amount "equal to ——% of the final loan amount" as compensation for its services. The agreement stated in a different paragraph *"Do not sign this agreement if it contains blank spaces."* (Emphasis in original).

### (3) *Mortgage Loan Origination Agreement* [9]

This form agreement stated that Mayher retained First Liberty to assist with obtaining a residential mortgage loan in the principal amount of approximately $207,000.00. The document stated that "We are licensed as a 'Mortgage Broker' under the law." It also stated that if Mayher had questions, she should contact Ma.

### (4) *Good Faith Estimate* [10]

This form stated that Mayher would likely incur $6,975.00 in closing costs for a conventional loan in the amount of $207,000.00 at 5.625%. The estimate identified $1,800.00 as First Liberty's mortgage broker fee. The proposed monthly payment (principal and interest) was estimated to be $1,191.61. There is no indication that mortgage insurance was required.

### (5) *Truth in Lending Disclosure* [11]

This document identified a $201,285.00 conventional loan at 5.625% with a monthly payment (principal and interest) of $1,191.61.

Mayher signed all of these documents at Botz's instruction. At the time that she signed, no one had signed any of the documents on behalf of First Liberty. Later, Ma signed the Mortgage Loan Origination Agreement as the "mortgage loan originator." He also signed the Uniform Residential Loan Application as the "face-to-face interviewer," although he never talked to or met with Mayher.[12] Additionally, Ma filled in the Retention Agreement so that it called for a "3–4%" fee to First Liberty.[13] And he altered the Uniform Residential Loan Application, crossing out the typed information that (1) the loan amount was $207,000.00 and handwriting $210,000.00; and (2) the interest rate was 5.625% and handwriting 6.75%. He did not communicate these changes to Mayher in any fashion.[14]

Several weeks later, Botz called Mayher and told her that she did not qualify for the 5.625% loan because Countrywide considered her to be a high risk because she had not held a job for the last two years. Instead, Countrywide would provide a loan at 6.75% that had to be covered by private mortgage insurance.[15] Mayher was surprised that anyone would consider her to be a high risk, but agreed to go ahead with the refinancing because Botz told her she could not get a better rate.

The loan refinancing closed on March 11, 2003. At that time, Mayher found that the final documents differed significantly from the earlier documents: the closing costs had escalated to $13,538.91,[16] with $6,540 to be paid to First Liberty, and her monthly principal and interest payment rose from the $1,191.61 estimate to

---

9. Exh. 16.

10. Exh. 6.

11. Exh. 7.

12. Exh. 5.

13. Exh. 15.

14. Exh. 5.

15. Joint Stipulations ¶ u.

16. Exh. 11.

$1,362.06. When the private mortgage insurance ($134.75) was added to the tax and hazard insurance payment, Mayher's new monthly payment totaled $1,915.50. Mayher questioned both changes, to which Botz responded that she was still better off than she would have been with her old loan. First Liberty was insolvent on the day the transaction closed.[17]

At some point after the closing, Mayher called Countrywide to ask a question. The person who took her call said that she was in a high risk loan when she actually qualified for a conventional loan at a lower rate. Mayher called Botz with this information, who answered that there was nothing to be done. Botz also told her that there would be another fee if she refinanced a second time.

### III. The State Court Lawsuit

On June 7, 2004, Mayher filed a state court complaint against First Liberty and Botz in the Cuyahoga County Court of Common Pleas, case no. CV–04–532122. She then filed a second amended complaint that added a claim against Ma personally and also asked that the corporate veil between Ma and First Liberty be pierced, with Ma being held responsible for the acts of First Liberty. On September 13, 2005, Mayher obtained a judgment against First Liberty and Ma in the amount of $142,877.42.[18] Ma obtained relief from the judgment against him personally. The state court judgment is, therefore, against First Liberty, only.

### IV. The Second Refinancing with Countrywide

On October 27, 2005, Mayher refinanced the loan with Countrywide. Based on a complete disclosure of her assets, she ob-tained a conventional loan at 6% interest with a monthly principal and interest payment of $1,381.36 and paid $5,223.50 in settlement charges. Countrywide did not require Mayher to purchase mortgage insurance.

### THE POSITIONS OF THE PARTIES

Mayher makes a two step argument: first, that the court should pierce the corporate veil between Ma and First Liberty, which would result in a finding that Ma is liable for the state court judgment entered against First Liberty; and second, that the state court judgment should be declared nondischargeable as against Ma under 11 U.S.C. § 523(a)(6) as debt based on a willful and malicious act. Ma argues that the evidence is insufficient to support piercing the corporate veil and that Mayher did not meet her burden of proving that Ma acted with the requisite intent to harm her.

### DISCUSSION

### I. The Debt[19]

█ The debt at issue is the judgment which Mayher obtained against First Liberty. As a corporation, First Liberty was a distinct legal entity which existed separate and apart from the debtor, its sole officer and shareholder. It is a fundamental rule of corporate law that shareholders, officers, and directors are not generally liable for the debts of the corporation. *Belvedere Condo. Unit Owners' Ass'n v. R.E. Roark Cos.*, 67 Ohio St.3d 274, 617 N.E.2d 1075, 1085 (1993). There is, however, an important exception to this rule. Under Ohio law, the corporate form may be disregarded and an individual

---

17. Request for Admission No. 15, deemed admitted by order dated May 23, 2006. *See* docket 29.

18. Exh. 20.

19. The parties agree that Ohio law controls this determination.

shareholder may be held liable for corporate wrongs when:

> (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

*Id.* at 1077, para. 3 of the syllabus. "Under this exception, the 'veil' of the corporation can be 'pierced' and individual shareholders held liable for corporate misdeeds when it would be unjust to allow the shareholders to hide behind the fiction of the corporate entity." *Id.* at 1085.

■■■ The first element addresses Ma's control over the corporation. This factor "is a restatement of the alter-ego doctrine, which requires that [the] plaintiff 'show that the individual and the corporation are fundamentally indistinguishable.'" *Taylor Steel, Inc. v. Keeton,* 417 F.3d 598, 605 (6th Cir.2005) (quoting *Belvedere,* 617 N.E.2d at 1086). To determine whether a corporation is the alter ego of an individual, Ohio courts consider these factors: (1) grossly inadequate capitalization; (2) failure to observe corporate formalities; (3) insolvency of the debtor corporation at the time the debt is incurred; (4) a shareholder holding himself out as personally liable for corporate obligations; (5) diversion of corporate funds or property for personal use; (6) absence of corporate records; and (7) the corporation used as a mere facade for the operations of the dominant shareholder. *LeRoux's Billyle Supper Club v. Ma,* 77 Ohio App.3d 417, 602 N.E.2d 685, 689 (1991). This list is, however, neither exclusive nor exhaustive. *Taylor Steel,* 417 F.3d at 605 (citing *Carter–Jones Lum-*

*ber Co. v. LTV Steel Co.,* 237 F.3d 745, 749 (6th Cir.2001) (applying Ohio law)).

The evidence proved that First Liberty was the alter ego of Ma. First Liberty was very thinly capitalized at its inception with only $500.00. There was no evidence that Ma made any additional capital contributions going forward, and the corporation was insolvent when it served as Mayher's broker and represented her on the refinance. Ma was the sole shareholder, served as the sole officer, and made all corporate decisions, exercising total control over the corporation throughout its existence. First Liberty did not observe any corporate formalities as, for example, by maintaining corporate records. *See* OHIO REV.CODE § 1701.37(A) (providing that a corporation "shall keep correct and complete books and records of account, together with minutes of the proceedings of its incorporators, shareholders, directors ..."). Ma also failed to maintain a distinction between First Liberty's liabilities and his own. This is shown by his willingness to write personal checks to employees to cover corporate wages. Despite Ma's attempt to characterize those transactions as loans, he did not document the "loans" or charge interest, an approach that clearly indicates that he viewed these corporate obligations as his own. The court concludes based on these facts that First Liberty did not maintain a separate corporate existence and Ma acted as its alter ego.

■■ The second element considers whether Ma exercised control over First Liberty "to commit fraud or an illegal act" against Mayher. *Belvedere,* 617 N.E.2d at 1086. Although the *Belvedere* decision refers only to fraud or illegal acts, the Sixth Circuit has noted that Ohio courts following *Belvedere* have found that this element also covers unjust acts, with the relevant question being whether it would be unjust

not to pierce the corporate veil. *See Taylor Steel*, 417 F.3d at 608–09.

Mayher argues that Ma exercised control over First Liberty to commit fraud or an illegal act against her under the Ohio law governing mortgage brokers. *See* OHIO REV.CODE § 1322.01, *et seq.*[20] The statute applies to the refinancing transaction because Mayher was a buyer, First Liberty was a mortgage broker and registrant, and Ma was a licensed loan officer as those terms are defined.[21] A buyer injured by a violation of these laws may seek an award of damages, plus attorney's fees and costs, and punitive damages. *See* OHIO REV.CODE § 1322.11(A). In addition, the superintendent of financial institutions may initiate criminal proceedings as to certain violations. *See* OHIO REV.CODE § 1322.11(B); *see also* OHIO REV.CODE § 1322.99 (establishing criminal penalties).

Mayher relies for her argument on §§ 1322.07 and 1322.062. Section 1322.062 requires a registered mortgage broker to provide a buyer with a mortgage loan origination disclosure statement as follows:

(A)(1) Within three business days after taking an application for a loan from a buyer, a registrant shall deliver to the buyer a mortgage loan origination disclosure statement that contains all of the following:

(a) The name, address, and telephone number of the buyer;

(b) The typewritten name of the loan officer and the number designated on the loan officer's license;

(c) The street address, telephone number, and facsimile number of the registrant and the number designated on the registrant's certificate of registration;

(d) The signature of the loan officer or registrant;

(e) A statement indicating whether the buyer is to pay for the services of a bona fide third party if the registrant is unable to assist the buyer in obtaining a mortgage;

(f) A statement that describes the method by which the fee to be paid by the buyer to the registrant will be calculated;

(g) A statement that the lender may pay compensation to the registrant;

(h) A description of all the services the registrant has agreed to perform for the buyer;

(i) A statement that the buyer has not entered into an exclusive agreement for brokerage services;

(2) If the loan is a covered loan as defined in section 1349.25 of the Revised Code, the registrant shall also deliver a copy of the mortgage loan origination disclosure statement to the lender.

(B) If there is any change in the information provided under division (A)(1)(f) or (h) of this section, the registrant shall

---

20. All references to chapter 1322 are to the version that was in effect at the time of the transaction.

21. Under § 1322.01, a buyer is "an individual ... who purchases the services of a mortgage broker for purposes other than obtaining a business loan ...", a loan officer is "an employee who originates mortgage loans in consideration of direct or indirect gain, profit, fees, or charges ...", a mortgage broker is "a person that holds that person out as being able to assist a buyer in obtaining a mortgage and charges or receives from either the buyer or lender money or other valuable consideration readily convertible into money for providing this assistance", and a registrant is "any person that has been issued a mortgage broker certificate of registration ... [.]" OHIO REV.CODE §§ 1322.01(A), (E), (G)(1), (J) (Anderson 2003). Ma does not argue to the contrary.

provide the buyer with the revised mortgage loan origination statement no later than three days after the change occurs, or the date the loan is closed, whichever is earlier.

(C) No registrant shall fail to comply with this section.

OHIO REV.CODE § 1322.062 (Anderson 2003). First Liberty as a mortgage broker acting through Ma clearly violated this provision because the evidence showed that no one gave Mayher a loan origination disclosure statement or any other document which included all of the required information at any time during the loan process.

Section 1322.07 sets out a number of prohibitions for mortgage brokers and licensed loan officers. The relevant subsections provide that they shall not:

> (C) Engage in conduct that constitutes improper, fraudulent, or dishonest dealings;
>
> * * *
>
> (E) Knowingly make, propose, or solicit fraudulent, false, or misleading statements on any mortgage document or on any document related to a mortgage, including a mortgage application, real estate appraisal, or real estate settlement or closing document. For purposes of this division, "fraudulent, false, or misleading statements" does not include mathematical errors, inadvertent transposition of numbers, typographical errors, or any other bona fide error.
>
> (F) Knowingly instruct, solicit, propose, or otherwise cause a buyer to sign in blank a mortgage related document[.]

OHIO REV.CODE § 1322.07(C), (E), (F) (Anderson 2003).

The administrative rules provide greater detail about the types of conduct that are considered improper, fraudulent, or dishonest. See OHIO ADMIN. CODE 1301:8–7–16. Such conduct includes permitting a person to originate loans, or holding a person out as being able to originate loans unless they are registered or licensed as a loan officer, see OHIO ADMIN. CODE 1301:8–7–16(A)(2), and materially underestimating closing costs, see Ohio Admin. Code 1301:8–7–16(A)(6). It is also a prohibited practice to knowingly make, propose, or solicit false or misleading statements on any mortgage document or on any document related to a mortgage. See OHIO ADMIN. CODE 1301:8–7–16(C)(2). And it is a prohibited practice to knowingly instruct, solicit, propose, or otherwise cause a buyer to sign a mortgage related document in blank, including, but not limited to, a mortgage application, real estate appraisal, or real estate settlement or closing document. See OHIO ADMIN. CODE 1301:8–7–16(C)(3).

Mayher proved that Ma, acting both through First Liberty and individually, violated these prohibitions in a number of ways. As a starting point, Ma permitted Botz to act as a First Liberty loan officer without a license; an act prohibited by § 1322.07(C). Ma countered that he believed Botz had a pending application. Whether Ma actually believed this or not, Ma still violated this provision because Ohio law provides that a person may not act as a loan officer without having first obtained a license. See OHIO REV.CODE § 1322.02(B) (Anderson 2003).

From there, First Liberty, acting through Ma, engaged in additional conduct which was improper, fraudulent, and dishonest under the terms of § 1322.07(C). This conduct included: representing to Mayher that she only qualified for a high risk No Income No Asset loan that required her to buy mortgage insurance and

pay a higher interest rate; telling Mayher to pay the Upland Mortgage note in full to increase the amount of money she had to borrow and hence increase the fees to First Liberty which were based on a percentage of the loan amount; providing a Good Faith Estimate which materially underestimated closing costs of $6,975.00 when the actual costs were nearly double that amount; altering the terms of the retention agreement to provide for a 3–4% fee to First Liberty when the Good Faith Estimate given to Mayher stated an $1,800.00 fee; and altering the Uniform Residential Loan Application without Mayher's consent or knowledge to change the loan amount and increase the interest rate. First Liberty, acting through Ma, also caused Mayher to sign the retention agreement in blank. As this agreement is a mortgage-related document, this violated § 1322.07(F).

Additionally, Ma as a licensed loan officer whose conduct was also governed by § 1322.07, personally engaged in the following improper and dishonest conduct: signing the Mortgage Loan Origination Agreement as the "mortgage loan originator" when that activity was actually performed by the non-licensed Botz; signing the Uniform Residential Loan Application as the "face-to-face interviewer" although he never met or spoke to Mayher; altering the Retention Agreement to provide for a sizeable increase in the broker's fee; and altering the Uniform Residential Loan Application to increase the loan amount and the interest rate without Mayher's consent and without communicating the changes to Mayher.

Based on these facts, Mayher proved that Ma exercised his control over First Liberty to commit illegal and unjust acts against Mayher and that it would be un-

just to permit the corporate form to shield Ma.

■ The third and final element asks whether Mayher's loss resulted from Ma's control of the corporation and its wrongdoing. This element requires that the "shareholder's control of the corporation proximately cause[ ] the plaintiff's injury or loss." *Belvedere,* 617 N.E.2d at 1086. Mayher proved this element because the causal connection between Ma's control of First Liberty and Mayher's loss is clear. The judgment against First Liberty is based on Mayher's claims that First Liberty (and Ma) misled her regarding the refinance, violated Ohio's mortgage broker requirements, committed fraud by inducing her to enter into the refinance, and negligently hired and retained Botz. Ma's knowledge of and participation in those matters was established in this proceeding. As a result, Mayher's judgment represents loss resulting from Ma's control of First Liberty.

Considering all of the circumstances, the court finds that First Liberty's corporate form should be disregarded and Ma should be held personally liable for the judgment debt.

## II. 11 U.S.C. § 523(a)(6)[22]

■ The next issue is whether Ma is sufficiently culpable with respect to the judgment debt that the debt should not be discharged in these proceedings. Mayher relies on bankruptcy code § 523(a)(6), which states that:

(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . .

(6) for willful and malicious injury by the debtor to another entity . . . [.]

11 U.S.C. § 523(a)(6). A creditor must prove that the injury was both willful and

---

**22.** At trial, Mayher withdrew her other claim   based on § 523(a)(4) of the bankruptcy code.

malicious to come within this exception. *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 463 (6th Cir.1999). This is a stringent standard and is limited to acts done with the intent to cause harm. *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). Mayher has the burden of proving each element of nondischargeability by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

The Sixth Circuit has held that "unless 'the actor desires to cause [the] consequences of his act, or … believes that the consequences are substantially certain to result from it,' he has not committed a 'willful and malicious' injury as defined under § 523(a)(6)." *Markowitz*, 190 F.3d at 464 (quoting Restatement (Second) of Torts § 8A, at 15 (1964)). In other words, the debtor "must have intended not only his conduct, but also the consequences of his conduct." *Gonzalez v. Moffitt (In re Moffitt)*, 252 B.R. 916, 922 (6th Cir. BAP 2000). A person acts maliciously when he acts in conscious disregard of his duties or without just cause or excuse. *Id.* at 923.

Mayher proved that her loss (the judgment debt) was caused by Ma's willful and malicious conduct. Ma exercised total control over First Liberty and he was directly and intimately involved in Mayher's refinance. Through her dealings with First Liberty and Ma, Mayher was induced to enter into the refinance agreement to her financial detriment. Mayher approached First Liberty seeking to refinance only the loan on her residence. She was told that First Liberty could help her obtain a mortgage at a favorable lower rate and she was persuaded to refinance an additional property as well. Mayher signed papers submitted by First Liberty regarding the loan which indicated that she was applying for a loan at 5.625% and estimated her closing costs at $6,975.00 (including a $1,800.00 broker's fee) to First Liberty. She was asked to and signed a retention agreement in blank. Ma then altered the loan documents to increase the interest rate to 6.75% and inserted a 3–4% broker's fee provision into the retention agreement. Mayher was then falsely told that she did not qualify for a more favorable traditional mortgage and that her only option was the loan which she ultimately took. The loan engineered by First Liberty and Ma was a high risk mortgage which required Mayher to carry mortgage insurance, had a 6.75% interest rate, and included total closing costs of $13,538.91 of which $6,540.00 went to First Liberty. Mayher, trying to lighten her financial load, ended up with a loan that required her to pay $209.63 more each month than she had been paying before she hired First Liberty.[23]

The facts unquestionably show that Ma acted deliberately and intentionally and that his acts had and could have no purpose other than to cause Mayher economic injury. Ma acted without regard for First Liberty's duties as a registered mortgage broker and his own duties as a licensed loan officer. Consequently, Ma's conduct with respect to the refinance that resulted in the judgment debt can only be described as willful and malicious and it cannot be discharged under § 523(a)(6).[24]

23. Under her original financing arrangements, Mayher made monthly payments of $1,512.88 to Fifth Third and $192.99 to Upland Mortgage, for a total of $1,705.87. After she refinanced through First Liberty, Mayher had a monthly payment of $1,915.50, for a difference of $209.63.

24. Ma's trial brief includes two arguments which are not well-developed. Ma argued: (1) that piercing the corporate veil does not

## CONCLUSION

For the reasons stated, Mayher is entitled to judgment on the complaint. A separate judgment will be entered reflecting this ruling.

## JUDGMENT

For the reasons stated in the memorandum of opinion entered this same date, judgment on the complaint is entered in favor of plaintiff Elaine Mahyer. Defendant-debtor Alan Ma is determined to be personally liable to the plaintiff in the amount of $142,877.42 and this debt is determined to be nondischargeable under 11 U.S.C. § 523(a)(6).

IT IS SO ORDERED.

impute intent; and (2) that collateral estoppel does not prevent this court from examining his intent in this action. As the court has determined that Ma had the requisite intent after a full evidentiary hearing, those arguments are moot.