[Cite as *Washington Cty. Bd. of Dev. Disabilities v. United Re AG*, 2013-Ohio-3419.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
WASHINGTON COUNTY

| | | |
|---|---|---|
| WASHINGTON COUNTY | : | |
| BOARD OF DEVELOPMENTAL | : | |
| DISABILITIES | : | Case No. 12CA47 |
| | : | |
| Plaintiff-Appellee, | : | |
| | : | |
| vs. | : | DECISION AND JUDGMENT |
| | : | ENTRY |
| UNITED RE AG., ET AL., | : | |
| | : | |
| Defendants-Appellants. | : | **Released: 07/26/13** |

_____
APPEARANCES:

George J. Cosenza, Parkersburg, West Virginia, for Appellant Hugh Scott.

Ethan Vessells, Fields, Dehmlow & Vessels, Marietta, Ohio, for Appellee.
_____

McFarland, P.J.

{¶1} Hugh Scott (hereinafter "Appellant") appeals the judgment of the Washington County Court of Common Pleas, granting judgment in favor of Washington County Board of Developmental Disabilities (hereinafter "Appellee") and against Appellant in his individual capacity. Upon review of the record, we find competent, credible evidence going to the material elements of the claim of Appellee for piercing the corporate veil and, as such, we decline to disturb the judgment of the trial court as being against

the manifest weight of the evidence. Because we find no error in the trial court's judgment, we overrule Appellant's sole assignment of error.

FACTS

{¶2} To a certain extent, we recount the facts as previously set forth in *Washington Co. Bd. of Developmental Disabilities v. United Re AG., et al.,* 4th Dist. No. 11CA23, 2012-Ohio-3338, 2012 WL 3017864. Appellee is a state agency with 65 employees, and it provides a health plan for its employees. In 2005, Appellee decided to use a partially self-funded health insurance plan that called for Appellee to acquire a re-insurance or "stop loss" policy. Employee Benefit Services of Ohio ("EBS") provided third party administrative services to Appellee. EBS processed Appellee's claims and billings. EBS also provided Appellee a quote from United Re AG (hereinafter "United") for a reinsurance policy. Based on the quote from EBS, Appellee enlisted with United. The stop-loss coverage plan stated United promised to provide stop-loss coverage for Appellee's employee health plan if: (1) individual employee claims exceeded $20,000.00 per individual employee ("specific coverage'), or (2) payment of any claims over $393,520.00 for the collective employees during the plan year ("aggregate coverage"). The plan year was February 1, 2006, through January 31, 2007. Appellee signed a Trust Agreement with United for stop-

loss coverage.  Appellee paid the premiums and fees to EBS to administer the claims.  EBS also paid the premiums to United for the stop-loss coverage.

{¶3} Appellee submitted a claim to United for over $200,000.00. After United failed to respond to Appellee's demands for payment, Appellee filed suit against multiple parties, including United, EBS, and two other companies, Vado AG and Texcess Re Inc. Appellee also sued Appellant claiming Appellant was personally liable for Appellee's claims against United.  Appellant is an attorney in Texas and Appellant has served as United's general counsel, president, and owner. (Appellee also filed suit against other entities not relevant to the first appeal or to this one.)[1]

{¶4} EBS filed cross-claims against United and Appellant.  (EBS filed suit against other entities also not relevant to either appeal).  United filed a cross-claim against EBS.  On March 25, 2011, EBS voluntarily dismissed its cross-claims against United and Appellant.  Additionally, on March 30, 2011, EBS filed a notice of automatic stay with the trial court indicating that EBS had filed for bankruptcy.  The trial court stayed the proceedings against EBS.  Thus, both Appellee and United's claims remained pending at the time of trial.

---

[1] The complaints against Vado AG and Texcess Re Inc. were mailed in care of Appellant to his law firm address in San Antonio, Texas.

{¶5} Prior to trial, United admitted that it was liable to Appellee for $200,496.44. The parties conducted a bench trial solely on the issue of whether Appellant could be held personally liable for Appellant's claims against United.

{¶6} At trial, Appellee argued United established a trust fund for employers to contribute their stop loss premiums, which United called "trust contributions." United utilized an "overlay endorsement" as part of their trust agreement, essentially a promise that United would procure additional insurance, "reinsurance" for the employers participating in the trust fund. Appellee argued Appellant established another company, Vado AG, ("Vado") to provide the reinsurance. However, Vado was not a licensed insurance company, and there was never any stop-loss coverage for Appellee. Appellee argued all the trust fund contributions/premiums were deposited in a bank account in Texas. United or its representatives would automatically take twenty percent from the account, leaving the remainder to pay for claims. Eventually, there was not enough money to pay claims.

{¶7} In summary, Appellee contended it had been defrauded by a Ponzi scheme established and operated by Appellant. Appellee argued Appellant owned all the shares of United and Vado; the companies never observed corporate formalities; and United and Vado were sham

corporations set up for the sole purpose of perpetuating fraud. There were only two witnesses testifying live at trial, and the evidence consisted chiefly of Appellant's testimony and the videotaped deposition testimony of Van A. Workman, (hereinafter "Workman").

{¶8} The trial court admitted various exhibits, including the following:[2]

1) Defendant's Exhibit 1-Articles of Incorporation for United Re AG;

2) Defendant's Exhibit 2-Assignment of shares of United Re AG to Jon R. Galland;

3) Plaintiff's Exhibit 2- March 27, 2006 letter;

4) Plaintiff's Exhibit 3- November 24, 2008 letter;

5) Videotaped deposition Workman;[3] and,

6) Plaintiff's Exhibit 10-Transcript of Appellant's deposition testimony.

{¶9} Defendant's Exhibit 1, the Articles of Incorporation for United Re AG are written in German.  Defendant's Exhibit 2 is a purported assignment of shares of United from Appellant to Jon Galland.  The document was unauthenticated and contained only Appellant's signature. Plaintiff's Exhibit 2 is a 2006 letter identifying Appellant as U.S. counsel for United. Plaintiff's Exhibit 3 was a 2008 letter which was authorized by

---

[2] The exhibit numbers are listed exactly as they appear in the index of the trial transcript.
[3] On the front page of the original deposition, it is written: "This is an admitted exhibit at Court trial 03/28/11."  It is signed by the trial judge.

Appellant and sent under his signature, although Appellant denied the signature was his. Plaintiff's exhibit 10 was a transcript of Appellant's deposition testimony taken in January, 2010.

{¶10} There was much to be gleaned from the November 17, 2010 deposition transcript of Workman, president of EBS. Workman testified to 36 years of experience in insurance. Workman testified he met Jon Galland (hereinafter "Galland") and Appellant in Texas at a meeting hosted by Galland in 2002. At that time, United was known as Texcess Re. The meeting took place in Appellant's law office in Texas. At the initial meeting, Appellant was identified as corporate counsel. Workman testified from the beginning, he thought Appellant had an ownership interest in the business, despite the ownership of the company being kept secret. Workman explained Texcess Re was a managing general underwriter while United was the trustee of a trust. The name "Texcess Re" changed to United in 2005. Workman's testimony, like Appellant's, was lengthy. It will be discussed in detail below.

{¶11 At trial, Appellant testified he did not own any of the companies, own shares in the companies, nor was he a member of the board of directors during the time in question. He acted only as president and corporate counsel. Appellant testified that he briefly acquired shares of United

(pursuant to Swiss law) in August 2002 and immediately transferred them to Galland.  After Galland died in 2008, Appellant reacquired the shares in 2010 from Galland's children. Appellant testified the purpose of acquiring the shares in 2010 was that by then, he was embroiled in legal proceedings and being deposed.[4]  In order to "become knowledgeable" for the purposes of defending himself and testifying, he needed to have access to the corporate documents.  Again, pursuant to Swiss law, he had to become a shareholder to gain access to the documents. Appellant reiterated during the relevant time period, (February 1, 2006 through January 31, 2007), he had no ownership interest in the United or Vado.

{¶12} After the trial concluded, Appellant and Appellee submitted alternate proposed findings of fact and conclusions of law. Ultimately, the trial court found in favor of Appellee and against Appellant.  On August 5, 2011, the trial court issued a judgment entry in favor of Appellee against both United and Appellant for compensatory and punitive damages.  On September 14, 2011, the trial court issued a judgment entry in favor of Appellee against both United and Appellant for attorney's fees.

{¶13} Appellant timely filed a notice of appeal. We eventually dismissed the first appeal based on our finding of no jurisdiction to consider

---

[4] Appellant, along with the United, Vado, and Texcess companies, was a named defendant in Franklin County Common Pleas case number 09CVA04-5784, captioned *The Ohio State University vs. Merchants 5 Star, Inc., Employee Benefit Plan, et al.,* filed in April 2009.  The case is now closed.

the appeal and thus, lack of a final appealable order. On October 30, 2012, Appellant timely filed the instant appeal. Where relevant, additional facts adduced at trial will be set forth more fully below.

## ASSIGNMENT OF ERROR

I.      THE TRIAL COURT ERRED WHEN IT GRANTED JUDGMENT FOR COMPENSATORY AND PUNITIVE DAMAGES AGAINST THE DEFENDANT, HUGH SCOTT, ON THE ASSERTION THAT THE DEFENDANT HUGH SCOTT WAS AN OFFICER OF UNITED RE AG AND OPERATED SAID COMPANY AS ITS ALTER-EGO OR OPERATED THE DEFENDANTS UNITED RE (sic) AND VADO IN SUCH A MANNER AS TO PERPETUATE A FRAUD AGAINST THE PLAINTIFF CREATING UNJUST AND INEQUITABLE CONSEQUENCES.

## STANDARD OF REVIEW

{¶14} In reviewing a trial court's judgment, it is well established that every reasonable presumption must be made in favor of the judgment and findings of fact. *Shemo v. Mayfields Hts.,* 88 Ohio St. 3d 7, 722 N.E.2d 1018, (2000); *Seasons Coal Co., v. Cleveland,* 10 Ohio St. 3d 77, 461 N.E.2d 1273 (1984). Furthermore, judgments supported by competent, credible evidence going to the material elements of the case will not be disturbed as being against the manifest weight of the evidence. *Shemo, supra; C.E. Morris Co. v. Foley Constr. Co,* 54 Ohio St. 2d 279, 376 N.E.2d 578 (1978), syllabus.

LEGAL ANALYSIS

{¶15} The general rule is that corporations are legal entities distinct from natural persons who compose them; therefore, officers, directors, and shareholders are not normally liable for the debts of their corporations. *Belvedere Condominium Unit Owners' Assoc., v. R.E. Roark Cos., Inc.,* 67 Ohio St. 3d 274, 287,  617 N.E.2d 1075 (1993); *Stewart v. R.A. Eberts Co., Inc.,*  4th Dist. No. 08CA10, 2009 Ohio-4418, 2009 WL 2684497, ¶15. "Because '[o]ne of the purposes of incorporation is to limit the liability of individual shareholders,' the party seeking to have the corporate form disregarded bears the burden of proof." *Id.; RCO Internatl. Corp. v. Clevenger,* 180 Ohio App. 3d 211, 904 N.E.2d 941, 2008-Ohio 6823, ¶ 10, quoting *Univ. Circle Research Ctr. Corp. v. Galbreath Co.,* 106 Ohio App.3d 835, 840, 667 N.E. 2d 445 (1995), citing Section 3, Article XIII of the Ohio Constitution.

{¶16} In *Belvedere,* the Supreme Court of Ohio held that in order to pierce the corporate veil and impose personal liability upon shareholders, the person seeking to pierce the corporate veil must show that: (1) those to be held liable hold such complete control over the corporation that the corporation has no separate mind, will, or existence of its own; (2) those to be held liable exercise control over the corporation in such a manner as to

commit fraud or an illegal act against the person seeking to disregard the corporate entity; and (3) injury or unjust loss resulted to the plaintiff from such control and wrong. *Id.*, at paragraph three of the syllabus; *Eberts, supra.*

{¶17} In *Dombroski v. Wellpoint, Inc.,* 119 Ohio St. 3d 506, 895 N.E.2d 538 (2008), the Supreme Court of Ohio addressed the question of "what conduct must be demonstrated to fulfill the second prong of the test for piercing the corporate veil created in *Belvedere*?" The Court concluded the test in *Belvedere,* if construed too strictly, "insulates shareholders when they abuse the corporate form to commit acts that are as objectionable as fraud or illegality" and thus was too limited to protect potential parties from the wide variety of egregious shareholder misdeeds that may occur. *Dombroski,* at ¶ 28, 617 N.E.2d 1075. Ultimately, the *Dombroski* court found a limited expansion of the *Belevedere* test necessary in order to allow the corporate veil to be pierced when a plaintiff demonstrates a defendant shareholder has exercised control over a corporation in such a manner "as to commit fraud, and illegal act, or *a similarly unlawful act."* (Emphasis added.) *Dombroski,* syllabus (modifying *Belvedere*); *Eberts.* ¶ 20. The Court emphasized, however that "[c]ourts should apply this limited expansion cautiously toward the goal of piercing the corporate veil only in

instances of extreme shareholder misconduct." *Id.,* at ¶ 29, 617 N.E.2d 1075; *Eberts, supra.*

## A.  The arguments on appeal.

{¶18} Appellant argues nothing in the evidence presented to the trial court demonstrated: (1) that he had an ownership interest in United, Vado, Texcess Re, or any of the other defendants during the relevant time period herein, February 1, 2006- January 31, 2007; (2) that he was a shareholder of any of the companies in question on the relevant dates; or (3) that he was a director of any of the companies in question during the relevant time period. Appellant contends Appellee's proof and the trial court's decision relied heavily on the deposition of Van Workman, president of EBS, and it was in Workman's interest to deflect responsibility of wrongdoing from his company EBS to Appellant and the other defendants.   Appellant emphasizes EBS filed bankruptcy during the pendency of the litigation and had, thus far, escaped liability for wrongdoing to Appellee.

{¶19} Appellant further argues Appellee has not provided proof regarding the factors noted by the appellate court in *Leroux's Billyle Supper Club v. Ma,* 602 N.E.2d 685, 77 Ohio App.3d 417: (1) grossly inadequate capitalization; (2) failure to observe corporate formalities; (3) insolvency of the debtor corporation at the time the debt is incurred; (4) shareholders

holding themselves out as personally liable for certain corporate obligations; (5) diversion of funds or other property of the company for personal use; (6) absence of corporate records; and (7) the fact that the corporation was a mere façade for the operations of the dominant shareholder(s).

{¶20} Appellee argues the trial court believed Appellant owned shares of United and "operated a Ponzi scheme under the guise of United Re, a sham corporation." Appellee counters the trial court had overwhelming evidence that Appellant perpetrated a fraud in his capacity as a corporate officer and overwhelming evidence to pierce the corporate veil of United and hold Appellant personally liable. Also citing *Leroux's Billyle Supper Club, supra,* Appellee submits, indeed, there was no evidence that United observed corporate formalities, such as having directors meetings, keeping corporate records, and maintaining a corporate bank account. Appellee concludes the trial court simply did not find Appellant a credible witness and it was inconceivable that Appellant was unaware that a fraud was being perpetrated. Upon review of the evidence contained in the record below, we agree with the trial court's decision.

B. Evidence regarding the history and formulation of United and Vado.

**{¶21}** Appellant was sued in his personal capacity as both a shareholder and an officer of United Re AG and Vado AG. The trial court held:

> "This Court finds that Hugh Scott has had complete control over the corporations known as United Re AG and Vado AG from their inception to the present time and he used his control to commit illegal and fraudulent acts in total disregard of the corporate entities directly and proximately causing injury and unjust loss to the Plaintiff from the numerous intentionally fraudulent, illegal, wanton, willful and wrong acts set forth herein above."

**{¶22}** Appellant testified Galland was the owner of a company called Texcess Re. Galland was in the insurance business and asked Appellant to incorporate Texcess, which had previously been a sole proprietorship. United was a company Appellant formed in Switzerland in 2002. Appellant testified to the tax advantages for a company doing business in Switzerland.

**{¶23}** At trial, Appellant denied being owner or shareholder of United between August 22, 2002 and September 2010. Galland was the only shareholder from 2002 until his death in 2008. [5] Appellant denied ownership of Texcess or Vado. He denied being a director for United or Vado.

**{¶24}** Appellant testified Swiss law required shares to be issued to an individual who physically receives them in Switzerland. 100 bearer shares were issued for United. Appellant received 98 shares from Hans Hagmann,

---

[5] Appellant also testified Galland was widely believed to have committed suicide after personal and financial setbacks culminated with his attempt to set fire to a courthouse in Texas in 2007.

a Swiss attorney who assisted Appellant, and then assigned to them Galland. It was never Appellant's intention to own or become shareholder of the company. The chief reason was to comply with Swiss law. Also, the assignment to Galland was in case something happened to Appellant on his way home. Appellant produced an assignment document at trial. The document was never executed by Galland.

{¶25} Appellant testified he had been president of United since 2004. He reacquired United in 2010 for the purpose of "gaining knowledge" as to the company's operations. By that time, he was going through hearings and depositions. Appellant claimed he did not know the identity of the shareholders, directors, and investors involved with United. He did not know the answers to questions when he was being deposed. Hagmann, the Swiss attorney, explained to him the only way to get access is if one is a shareholder. Appellant approached Galland's father and eventually worked out an assignment of shares from Galland's children through an attorney in Texas. Appellant currently owns all shares of United. He testified United ceased operation on December 31, 2010, without having paid all outstanding claims.

{¶26} Appellant testified Vado was a Swiss company, formed in 1983, which he reinstated. It had not been publicly traded since 2003. Vado

was not an insurance company in the United States or in Europe. Appellant agreed Vado was the company that was actually supposed to be providing the stop loss coverage for Appellee and other employers that selected the overlay provision. Appellant explained Vado would solicit individuals to agree to be responsible if Vado had to pay excess claims. Appellant further explained Vado was like Lloyds of London risk pools. However, he testified he had never seen a list of risk investors and did not know who they were, other than an individual named Tony Vaughn, now deceased. He admitted his parents were involved with Vado in 2005. Appellant testified he did not know how much risk was accepted. Vado's activities were performed without any oversight by federal and state governments.

{¶27} Appellant testified Vado was disclosed to EBS as the entity providing the stop loss coverage, but he was unaware if it was disclosed to the employers, such as Appellee. Appellant minimized his involvement at the initial meeting with Workman and others, hosted by Galland at Appellant's law office in Texas, in 2002. He testified he was present as counsel, answered one question, and did not see the others until 2004.

{¶28} The evidence at trial demonstrated Appellant was the only person to give testimony regarding the history and formation of United and Vado. The trial court pointed out various discrepancies between Appellant's

previous depositions and his trial testimony. The court remarked Appellant

"testifies in a manner which always comports with his best interests." We

agree.

### C. Evidence regarding the fraud perpetrated upon Appellee.

{¶29} The trial court's decision states:

> "Mr. Scott knew that WCBDD had retained EBS of Ohio to establish its employee health plan and ended up selecting United Re to provide the stop-loss coverage for its partially self-funded employee health plan. He knew that the stop-loss coverage was procured using the "overlay" endorsement, as part of the United Re Trust Agreement."

{¶30} The trial court found Appellant knew many of the employers

such as Appellee selected an "overlay" provision. When an employer

selected the overlay provision, that meant United was supposed to use

employer contributions (premiums) to acquire reinsurance coverage for the

participating employer. The trial court noted Van Workman's testimony that

the overlay endorsement specifically stated United would procure

reinsurance with an insurance carrier. The trial court found Appellant knew

United never purchased actual insurance with an insurance carrier. The trial

court noted the absence of any certificate or document evidencing stop-loss

insurance was provided to Appellee.

{¶31} Appellant's testimony demonstrated Appellee was to send its

contributions/premiums to EBS, the third party administrator, in order to get

stop loss coverage for its employee health plan. EBS would take its fees and commissions and send the rest to United. Many employers selected an overlay provision, which meant United was to use the premiums to buy reinsurance coverage for the participating employer. Appellant identified the overlay provision which had been added as an exhibit to Workman's deposition. Appellant acknowledged the overlay provision indicated a carrier would be selected for reinsurance. However, Appellant also acknowledged there was no documentation from Vado that Appellee actually had stop loss coverage. The trial court found Appellant knew Vado was supposed to be providing the stop-loss coverage for Appellee's health plan.

{¶32} In addition, Appellant testified employer monthly contributions were placed in the Blanco National Bank in Texas. Appellant further testified there were two accounts at Blanco National Bank, a claims account and an operating account. The money was paid into the claims account. Then 20% was taken out and put in to the operating account for United. The remaining 80% was to pay claims, plus funds acquired by the risk pool investors. As president of United since 2004, Appellant had authority to write checks. Eventually, there was not enough money in the Blanco National Bank account to pay the stop-loss claims. Appellant also testified

Vado did not keep a separate bank account in the United States. The trial

court held:

> "The evidence (most of it admitted) clearly shows that United Re
> purported to be a financially-solvent stop-loss carrier promising to
> procure actual insurance to cover the risks of its clients. This was a
> complete fraud. There never was insurance….Money was deposited
> in, and then taken out of, the same bank account with no regard for
> whether the participating employer's risks were covered."

**{¶33}** The trial court further opined:

> "[M]r. Scott does not see any impropriety in using the employer
> contributions to fund the stop-loss claims for the other employers. He
> knew the overlay provision which provided for the procurement of re-
> insurance was not properly funded nor even in place. He sees no
> impropriety even when the overlay provision promised the
> participating employer that re-insurance would be acquired using an
> insurance carrier… This Ponzi scheme, as with all Ponzi schemes,
> collapsed from its own fraudulent weight. In view of all of this, this
> Court concludes a fraud has been perpetrated on WCBDD."

**{¶34}** We agree with the trial court's conclusions herein, based on the

additional considerations which will be discussed below, the lack of

corporate formalities and Appellant's lack of credibility.

D. Evidence regarding the lack of corporate formalities.

**{¶35}** The testimony presented to the trial court demonstrated a

significant absence of observance of corporate formalities. Appellant

testified United was not publicly traded. United is not and had never been a

licensed insurance company. United has never had a type of insurance

rating.[6] He testified United did not keep a balance sheet, cash flow statement, profit and loss statement, or separate bank account. There were never any shareholder meetings or directors meetings.

{¶36} Appellant testified United had no employees, only a few "independent contractors" who worked from home to process claims. He indicated the business essentially "ran itself." Debbie Williams, an independent contractor who processed claims, consulted with Appellant at times as to whether or not to pay certain claims.[7] Again, Appellant had authority to write checks. The trial court reasoned because Appellant was United's chief counsel and United and Vado had only one or two employees, Appellant had to know of their day to day operations and transactions.

### E. Appellant's sheer lack of credibility.

{¶37} In its findings of fact and conclusions of law, the trial court explicitly commented four times on Appellant's lack of credibility. Appellant testified as to his practice of law and work record since 1977. Appellant's experience was in setting up offshore companies and has established businesses in the Cayman Islands and Switzerland.

---

[6] Van Workman testified an A.M. Best rating is a financial rating given to an institution by a firm and it is based on the firms "financials." He summarized that an A. M. Best Company rating will shed light on an insurance company's strength.

[7] Appellant testified Debbie Williams, whose medical experience or background he had no knowledge of, processed claims out of her home. He further testified due to threats on her life from an unhappy claimant, she started identifying herself at times as "Susannah Jones." Documents and email support the testimony that two names were used.

**{¶38}** The trial court wrote:

"Hugh Scott claims that he initially owned the shares and conveniently transferred all of the shares during the entire period of a classical fraudulent Ponzi scheme, only to end up with all the shares once again after all the damage had been done. This entire scenario is not believable and is not supported by credible evidence."

**{¶39}** The trial court noted Appellant's deposition testimony that he had no records of who owned the shares of United or when the shares may have been transferred. The trial court noted this contrast with the trial testimony that Galland was the owner of the initial shares. The trial court emphasized Appellant's testimony that the heirs of Galland transferred shares to him in 2010, while acknowledging that there was no probate for the estate of Galland, that it was a 'no asset" estate. The court noted such a transfer would have been completed without any supervision of a Texas probate court. The court noted there were no stock certificates to memorialize the transfer. The court further scoffed at Appellant's explanation that he reacquired the shares in order to obtain knowledge of United's operations. [8] The trial court concluded that there was no "transfer" of shares to Appellant and that he had them from inception.

**{¶40}** The trial court also noted Appellant's trial testimony that several years ago, he signed an employment contract in which he purported

---

[8] The trial court noted in parentheses "Apparently being president and chief counsel was not sufficient status to obtain the necessary information."

to be the president of Vado AG. The trial court found this testimony contradicted Appellant's January 2010 deposition testimony wherein he stated he knew nothing about Vado. The trial court further noted in the January 2010 deposition testimony, Appellant stated he had "no idea" whom the risk investors were for Vado AG, yet at trial disclosed his own parents had invested in the Vado AG risk pool.

{¶41} Also at trial, Appellant identified a letter explaining Vado's operations he signed as president of United in 2008. Appellant testified Galland composed the letter and asked him to sign it. The trial court found this letter directly contradicted Appellant's January 2010 testimony in which he claimed to know nothing about Vado's operations and further, that he did not know who Vado's shareholders were.

{¶42} The trial court also noted Appellant's trial testimony that Vado was not an insurance company in the United States or Europe, as contrasted with the January 2010 deposition testimony that Vado was the "reinsurer" for United. He testified he did not know how much risk was accepted. Appellant testified there was no intent to defraud anyone although he regretted Appellee did not get the benefits of its "stop-loss" insurance. Appellant commented "[A] lot of deal don't work out and this is just one of them."

{¶43} The trial court held:

"Hugh Scott created and readily participated in [this] ongoing fraud. He has a history of participating in fraudulent schemes."

{¶44} Finally, the trial court also noted Appellant's history of being involved with fraudulent schemes and taking bankruptcy. At trial, Appellant admitted during the 1990's he was involved in setting up an enterprise involving yogurt franchises in Texas. The investment failed, and the yogurt investors believed they had been defrauded and sued Appellant and other defendants. He acknowledged a judgment was entered against him, he filed personal bankruptcy, and the lawsuit was settled by way of a non-dischargeable agreed judgment. [9]The trial court noted the evidence showed Appellant had never disclosed the yogurt enterprise and subsequent litigation to the people at EBS or others when promoting the United business.

{¶45} The trial court was in the best position to weigh the evidence and assess the credibility of the witnesses. We defer to its judgment.

CONCLUSION

{¶46} Based on our review of the record, we believe the trial court had competent credible evidence of the required factors set forth in *Belvedere, supra,* to pierce the corporate veil and hold Appellant personally

---

[9] The court's findings of fact and conclusions of law discuss the yogurt case at length. The case proceeded to the Texas Court of Appeals, Crescendo Investments, Inc. v. Brice, 61 S.W.2d 465 (2001). The Texas Court of Appeals opinion stated "The Plaintiffs were victims of an investment scheme directed by Hugh Scott."

liable for the compensatory and punitive damages entered in judgment against him. Like the trial court, we find it suspect that Appellant established the company in 2002, immediately transferred the shares to Galland, and then reacquired the shares after Galland's death, and after the damage was done to Appellee and others. Appellant offered no physical proof or written evidence to support his contention that Galland was the true owner and operator of United and Vado. We also find both the unauthenticated assignment of shares document and the assignment to Appellant from the estate of Galland, with no probate court oversight, suspect. We also find the fact Appellant solicited business and held himself out at times as president and/or corporate counsel of United, signed letters, trust documents, and checks as president or on behalf of United, yet claimed no knowledge of the day to day workings of United to be suspect. We find the evidence established Appellant had complete control over United since its inception in 2002 and through the relevant time period of 2006-2007, to the present. The evidence demonstrates United had no separate mind, will, or existence of its own, apart from Appellant.

{¶47} We further find United's lack of observance of corporate formalities, especially with regard to bank records, and the use of independent contractors, suspect. The main claims reviewer held herself out

under two names. The purported owner at the time of the fraud perpetuated on Appellee, Galland, is dead. The only known risk sharer of Vado, (aside from Appellant's parents who are elderly and supposedly unable to be deposed), Tony Vaughn, is also dead. The only person who can provide knowledge of how the two companies, United and Vado, operated is Appellant, whose track record with at least one previous corporate enterprise is not only not successful, but also deemed fraudulent by the Texas appellate court.

{¶48} We find, as did the trial court, it is obvious from the evidence Appellee paid for stop loss coverage and did not receive it. It is obvious United and/or Vado did not purchase the stop loss coverage and that Vado was not fully funded, although Appellee and other fraud victims were lead to believe otherwise. We agree with the trial court's conclusion that Appellant owned the shares of United during the entire period after 2002 and the inconceivability of the suggestion that Appellant did not know fraud was being perpetrated on Appellee and its employees. Appellant's control of United and wrongful actions resulted in injury and unjust loss to sick and ill people. We find the judgment of the trial court was supported by competent credible evidence. We overrule Appellant's sole assignment of error and affirm the judgment of the trial court entering judgment against Appellant

for compensatory damages in the sum of $200,496.44, plus court costs and

legal interest from the date of journalization of the trial court's entry, as well

as a punitive damages award of $400,00.00 against both United and

Appellant, individually.

**JUDGMENT AFFIRMED.**

# **JUDGMENT ENTRY**

It is ordered that the JUDGMENT BE AFFIRMED and that the Appellee recover of Appellants costs herein.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Washington County Common Pleas Court to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Exceptions.

Abele, J.:   Concurs in Judgment Only.
Harsha, J.:  Dissents.

For the Court,

BY:   _____
Matthew W. McFarland
Presiding Judge

## **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**